**EXHIBIT A: Undisclosed Emails and Meet and Confer Letter**

On Aug 13, 2025, at 2:13 PM, Rebecca O'Brien <Rebecca.OBrien@pcao.pima.gov> wrote:

Mr. Gerrits,

Thank you.  We went ahead and filed our motion for a brief extension of time. We will include our arguments about the lack of any claim alleged by your LLC in our response when filed.

*Rebecca O'Brien*

*Supervising Attorney, Tort Unit*

*Pima County Attorney's Office, Civil Division*

*32 N. Stone #2100*

*Tucson, AZ  85701*

*(520) 724-5700*

*Rebecca.OBrien@pcao.pima.gov*

On Aug 13, 2025, at 2:29 PM, shawn gerrits <shawn.gerrits@yahoo.com> wrote:

Thanks for that follow up.   Have a great afternoon!

I look forward to reading your motion when you finish it it in couple of weeks.

Best regards,

Shawn

Tucson, AZ 85718

520.990.5209

6

# Laura Conover
## Pima County Attorney



(520) 724-5700
pcao.pima.gov
32 N. Stone Avenue, Suite 2100
Tucson, AZ 85701

### Civil Division

Mr. Gerrits,

The County Defendants in this case intend to file a motion to dismiss a number of the counts in the First Amended Complaint ("FAC") based on failure to provide a short and plain statement of the claim pursuant to Fed. R. Civ. P. 8, and a failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Pursuant to LRCiv. 12.1(c) we hereby notify you of the issues we intend to assert in our motion and ask that you would dismiss or amend the claims, and dismiss the parties noted.

- **PDS, OCAC, and OCC**: These three departments are non-jural entities and cannot be sued. No Arizona statute confers on them the power to sue or be sued. *See Yamamoto v. Santa Cruz Cty. Bd. Of Supervisors*, 606 P.2d 28, 29 (Ariz. Ct. App. 1979). Further, no claims are actually brought against PDS or OCC.
- **Count 1**: The FAC does not plausibly allege that your contract work with OCAC was a "service, program, or activity" offered by Pima County. It also does not plausibly allege you are a qualified individual under the ADA.
- **Count 2**: The FAC does not plausibly allege you are disabled within the meaning of the Rehabilitation Act, nor that you were denied any benefits solely by reason of any alleged disability.
- **Count 3**: The FAC does not plausibly allege you engaged in a protected activity under the ADA, nor that Pima County engaged in an adverse employment action. There is also no plausible link between the two.
- **Count 4**: The FAC does not plausibly allege that you were similarly situated to other OCAC contract attorneys with known or perceived mental health conditions who made comparable professional communications. Also, neither Defendant Brault nor Aja are part of OCAC.
- **Count 5**: The FAC does not plausibly allege a claim for violation of the 14th Amendment under the Stigma-Plus doctrine because it fails to allege a deprivation of a tangible liberty or property interest. *Schwake v. AZ Board of Regents*, 821 F.3d 917 (9th Cir. 2002); *Blantz v. Cal. Dept. of Corr. & Rehab.*, 727 F. 3d 917 (9th Cir. 2013).
- **Count 7**: The FAC does not plausibly allege a claim for First Amendment Retaliation by Defendants because it is conclusory and does not allege that any of the defendants' alleged actions were substantially motivated as a response to your exercise of alleged constitutionally protected conduct. *Mendocino Environmental Center v. Mendocino County*, 192 F. 3d 1293 (9th Cir. 1999).
- **Count 9**: The FAC does not plausibly allege a violation of procedural due process rights against Defendants Brault and Mendola because it does not plausibly allege a protected liberty or property interest.

- **Count 10**: The FAC does not plausibly allege the existence of a policy, custom or practice, does not allege that such a policy was a moving force behind any constitutional violation, and does not describe the nature of the alleged constitutional violation.
- **Count 11**: The FAC does not plausibly allege the existence of a conspiracy. No allegations evidence a conspiracy, actions in furtherance of a conspiracy, or what rights the alleged actions deprived you of.
- **Count 12:** The FAC does not plausibly allege a defamation claim based on Defendants' alleged informal reports to OCAC accusing you of being racist or sexist. These are statements of opinion that cannot form the basis of a defamation claim. In addition, there are no allegations supporting any defamation claim against the Doe Defendants or Defendants Brault or Mendola.
- **Count 13**: The FAC does not plausibly allege a false light claim against Defendants. There are no specific allegations that any specific defendant placed you in a false light, nor are there any specific allegations that any specific defendant gave publicity to false information that a reasonable person would find highly offensive.
- **Count 14:** Public disclosure of private facts. The FAC does not plausibly allege a claim for public disclosure of private facts because the allegations are conclusory and there are no specific allegations that Defendant Aja gave publicity to true private facts.
- **Count 15:** The FAC does not plausibly allege a claim for tortious interference with contract by any of the defendants because it does not allege that any of their actions caused a breach or damages.
- **Count 16**: The FAC does not plausibly allege abuse of process. Service of the IAH on July 17, 2024 was a lawful action that gave effect to an otherwise meaningless court order.
- **Count 17**: The FAC does not plausibly allege breach of confidentiality. HIPAA does not apply to Ms. Aja. There is no allegation as to where a duty of confidentiality would arise under state law.
- **Count 18**: The FAC does not plausibly allege intentional infliction of emotional distress. All of the alleged wrongful actions were appropriate legal decisions.
- **Count 19**: The FAC does not plausibly allege any violation of the implied covenant of good faith and fair dealing—the contract in question did not guarantee any case assignments.
- **Count 20**: The FAC does not plausibly allege any breach of contract regarding the failure to assign cases. The contract in question did not guarantee any case assignments. Furthermore, the FAC alleges that you are currently providing services under the terms of the contract.
- **Count 21**: The FAC does not plausibly allege constructive fraud. There is no allegation of a fiduciary or confidential relationship and none exists as a matter of law.

Finally, Defendants Aja, Brault and Mendola are all named in their individual and official capacity, but no claim is alleged against any of them in their official capacity.

Please advise by no later than close of business on Tuesday, August 12, 2025 if you will agree to dismiss PDS, OCAC, and OCC as well as Defendants Aja, Brault and Mendola in their official capacities, as well as dismiss or amend the claims alleged in Counts 1-5, 7,9, and 10-21. We apologize for the short timeframe, but if we do not hear from you, we plan to file a motion to dismiss on Thursday, August 14, 2025. Alternatively, if you need more time to consider these

issues, please advise if you will stipulate to extend the Defendants' August 14, 2025 responsive pleading deadline.

Sincerely,

Tyler Campman

Deputy County Attorney

TC/RKO

# EXHIBIT B

**The Law Office of Shawn Gerrits PLLC**
**3430 E. Sunrise Drive STE 180**
**TUCSON, AZ 85718**
**Shawn Gerrits, Attorney at Law**
**Arizona State Bar No. 033232**
**Telephone: (520) 990-5209**
**Email: shawn.gerrits@yahoo.com**

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

In the matter of:

**SHAWN GERRITS; THE LAW OFFICE OF SHAWN GERRITS, PLLC, PLAINTIFFS**

V.

**PIMA COUNTY; JILLIAN AJA; DEAN BRAULT; BENJAMIN MENDOLA; AND DOES 1–10, DEFENDANTS**

**Case: 4:25-cv-00454_____**

**COMPLAINT (Second amended)**

**(TIER 3 JURY TRIAL DEMANDED)**

HONORABLE
Rosemary Marquez_____

## I.    INTRODUCTION

This civil action arises from a coordinated pattern of retaliation, defamation, and civil rights violations targeting Plaintiff Shawn Gerrits, a licensed Arizona attorney and court-appointed counsel, and The Law Office of Shawn Gerrits PLLC (the PLLC), his professional entity. The defendants, including Pima County, its supervisory personnel, and related offices, undertook a series of adverse actions against Plaintiff, including:

A.    Discrimination and retaliation based on disability under the Americans with Disabilities Act (ADA),

B.    Interference with protected First Amendment activity,

1

C.     Violations of Fourteenth Amendment due process and equal protection,

D.     Defamation, false light, invasion of privacy,

E.     Tortious interference with contractual relations,

F.     Abuse of process,

G.     Conspiracy, and

H.     Breaches of confidentiality.

These acts were not isolated missteps but part of a deliberate, retaliatory campaign following Mr. Gerrits' exercise of protected legal rights and disclosure of a temporary mental health condition. The Plaintiff seeks compensatory, emotional distress, and reputational damages, as well as punitive damages against individual actors, declaratory relief, and all available legal remedies under federal and Arizona law. This is not a routine employment dispute.

It is a civil rights case about what happens when public legal authorities, attorneys and agency leaders, coordinate to weaponize mental health information, retaliate against protected speech, and destroy the career of a public defense attorney in a moment of temporary vulnerability.

What makes this case uniquely dangerous is not just the misconduct itself, but the status of the actors involved: senior officials with access to legal tools, confidential records, and decision-making power, using that authority to punish dissent and stigmatize disability.

This is not merely a case about Shawn Gerrits <u>or one small business</u>. It is a

2

case about whether public institutions can turn a private medical crisis into a professional death sentence for both and do so without consequence.

The facts reveal cross-agency coordination, including prosecutorial offices, influencing defense contracting decisions. Such conduct strikes at the core principles of our adversarial system of justice, especially in Arizona, a jurisdiction already under federal scrutiny for their treatment of mental health issues. The U.S. Department of Justice issued a formal warning to Arizona agencies about their mishandling of mental health in the legal system.

At stake is more than one career. It's the constitutional promise of due process, the ethical obligation to respect disability rights, and the systemic need to preserve the independence of public defense.

## II.    JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 for federal claims, and supplemental jurisdiction under 28 U.S.C. § 1367 for state claims. Venue is proper under 28 U.S.C. § 1391 as all relevant acts and omissions occurred within this district.

## III.    PARTIES

A.    Plaintiff Shawn Gerrits is a resident of Pima County, Arizona, and a licensed attorney contracted as court-appointed counsel in Pima County and Santa Cruz County. He is employed part-time by the Cochise County Legal Advocate.

3

B.    Plaintiff The Law Office of Shawn Gerrits PLLC is a professional limited liability company duly organized and existing under the laws of the State of Arizona pursuant to A.R.S. §§ 29-3101 et seq., with its principal place of business located at 3430 E. Sunrise Drive, Suite 180, Tucson, Arizona 85718. The PLLC is the direct contracting entity with Pima County for the provision of court-appointed legal services under the FY 2024–2025 and FY 2025–2026 contracts. The PLLC executed these contracts, received all payments and assignments thereunder, and suffered independent economic injuries from Defendants' breaches and related misconduct, including lost revenue, assignments, business goodwill and loss of future business expectancy.

C.    Defendant Pima County is a political subdivision of Arizona.

D.    Defendant Jillian Aja is sued in her individual capacities for actions outside the scope of her official duties.

E.    Defendant Dean Brault is sued in his individual capacities for actions outside the scope of his work.

F.    Defendant Benjamin Mendola is sued in his individual capacities for actions outside the scope of his work.

G.    Defendants Does 1–10, are individuals whose identities are currently unknown but who, acting in their personal capacities and outside the scope of any lawful government authority, participated in the unlawful and retaliatory conduct described herein. This includes, but is not limited to:

4

1.    Individuals who improperly accessed or disclosed Plaintiff's confidential hospital location, mental health status, or other protected personal information to Defendant Jillian Aja and others; for the purpose of serving legal papers or influencing official evaluations;

2.    Individuals who referred to by Benjamin Mendola as "The Deciders;"

3.    Individuals who participated in monthly evaluation meetings concerning Plaintiff's contract status and contributed false or misleading information to the court or supervising agencies;

/

4.    Individuals within the Arizona Attorney General's Office or affiliated agencies including those who organized or attended meetings, or shared sensitive or incorrect information discussing Plaintiff's medical or professional status without lawful basis, and in furtherance of retaliatory and/or exclusionary objectives;

5.    Individuals who collaborated with Defendant Jillian Aja by submitting or circulating anonymous complaints, falsely accusing Plaintiff of racism, sexism, or other misconduct; for the purpose of damaging Plaintiff's professional standing, the reputation and goodwill of his PLLC and justifying his removal from contract privileges, leading directly to harms to Mr. Gerrits personally and professionally, also leading to losses to the PLLC entity as a direct

5

result. Plaintiffs will seek to identify these individuals through discovery and will amend this Complaint as appropriate upon learning their identities.

## IV.    FACTUAL BACKGROUND

A.    National Context and Initial Concerns

1.    On July 13, 2024, in the wake of the attempted assassination of President Trump, Mr. Gerrits experienced significant emotional distress. Like many Americans, he was shaken. His concern came from a deep love for his country, and a fear that it was becoming too divided to heal. The same day, he contacted Chris Lloyd, a longtime friend, to express concern about defamatory rumors and to discuss his personal political beliefs and potential paper idea about media coverage and political violence. During this conversation, Mr. Gerrits expressed that he was aware of defamatory rumors being spread about him within his professional circles and stated that he intended to take legal action if the harassment continued. He reaffirmed his independence as a court appointed defense attorney and made clear that the Attorney General's Office had no legal authority or ethical justification to interfere with his contract or professional standing. Mr. Lloyd replied, "Are you ok?" and offered to help.

6

B.    Mental Health Evaluation and Hospitalization

1.    On July 15, 2024, at the request of Plaintiff's spouse, Yang Wang, due to concerns for her husband's wellbeing and fear of self-harm, Tucson Police Department placed Mr. Gerrits under a 72-hour involuntary psychiatric hold. He was admitted for mental health evaluation at Palo Verde Behavioral Health on July 16, 2024.

2.    July 15, 2024 – Yang Wang called OCAC to report that her husband, Mr. Gerrits, was experiencing a medical emergency and they were in route to the hospital. OCAC employee Kristina Dunlap returned the call and stated she would arrange coverage for Mr. Gerrits's scheduled cases.

C.    Injunction Filed and Dismissed

1.    On July 16, 2024, Defendant Jillian Aja, Bureau Chief of OCC, filed an Injunction Against Harassment (IAH) against Mr. Gerrits based on the text messages sent to Chris Lloyd. Notably, the messages were not directed to Aja, not sent to her. Lloyd himself testified on September 3, 2024, during the IAH hearing, that he did not feel he was being threatened. The court dismissed the IAH in full after reviewing the full text messages and listening to testimony provided by both Lloyd and Aja; and issued a directed verdict.

2.    Following the filing of the IAH, a Tucson Police Department detective

7

contacted Ms. Wang several times to follow up on the allegations. After a brief investigation, TPD returned the family's firearms, confirming that law enforcement found no credible threat or legal basis for intervention.

D.    Prior Workplace Tensions

1.    Leading up to these events, Mr. Gerrits experienced escalating workplace hostility from a group of attorneys at Juvenile Court, including Defendant Jillian Aja. Several members of this group engaged in unprofessional conduct toward Plaintiff Gerrits, including yelling at him in court hallway areas, sometimes in front of clients or colleagues. One attorney, Assistance Attorney General Kaylin Payce, accused Plaintiff of gender bias after receiving a routine work-related email, alleging that he would not have sent such an email to a male attorney. In response, Mr. Gerrits forwarded examples of similar emails he had sent to male attorneys to demonstrate consistent professional communication, regardless of gender. These incidents contributed to a hostile environment for Plaintiffs within the legal community.

2.    On June 29, 2024, two days after the debate, Mr. Gerrits sent a mild, election-related joke email intended to ease tensions with colleagues who he's had terse exchanges with so that it didn't cross a line. Instead,

8

Defendant Aja and a few others submitted anonymous complaints accusing him of being both a "racist" and "sexist," despite his longstanding commitment to underserved clients. On or about July 2, 2024, Defendant Mendola, OCAC Director, warned Mr. Gerrits that "a group is going after you" but assured him no formal consequences would follow, and that there was no need to apologize to the attorneys in the email thread. The anonymous complaints and gender-based accusations submitted against him were never formally investigated or corroborated by OCAC, or PDS leadership, reinforcing that these allegations were used not as part of any fair process, but as pretext for exclusion driven by personal bias and retaliation.

3.    Defendant Aja testified under oath at the September 3, 2024, IAH hearing that she was the anonymous individual who reported Plaintiff Gerrits to Mendola, accusing Mr. Gerrits of "racist" and "sexist" comments for his post-debate joke. Aja stated in court that she found the term "Viking" offensive and racist. Jillian Aja has a documented history of targeting Plaintiff Shawn Gerrits. At the IAH hearing, she admitted to previously supervising Mr. Gerrits at OCC and terminating his position, invoking "at-will" status as justification. At the time, Mr. Gerrits had just welcomed a newborn with his wife. Mr. Gerrits was then escorted from the premises by armed guard to retrieve his

belongings, an unnecessarily punitive and stigmatizing act. After Mr. Gerrits was terminated from OCC, the reason listed by the Unemployment Office was that his position was "no longer available."

4.    At the time of the IAH filing, Plaintiff Gerrits did not know that Defendant Jillian Aja was one of the anonymous individuals who had filed internal complaints against him, or that she was the decision-maker responsible for terminating his position with OCC.

E.    Retaliation Based on Political Speech (IAH Hearing and Viewpoint Discrimination)

1.    During the IAH hearing on September 3, 2024, Defendant Jillian Aja testified that Plaintiff Gerrits's private reference to the 1994 Crime Bill reflected "his position on the assault weapons ban." The text message contained no reference to firearms, only criticism of the bill's role in mass incarceration and its disproportionate impact on Black and Latino communities. However, even if Mr. Gerrits had expressed a negative opinion on the 1994 assault weapons ban, protection to express that viewpoint is robustly protected under the laws of both Arizona and Federal law.

2.    Defendant Aja's attempt to portray this political commentary as evidence of dangerous views reveals viewpoint discrimination and personal animus. Her comment mischaracterized protected speech and

10

was used to justify initiating the IAH and spreading stigmatizing narratives. This caused personal and financial harm to both plaintiffs.

3.      Mr. Gerrits's free expression focused on criminal justice reform, racial equity, and opposition to government overreach, and was core political speech under the First Amendment. Using it as a basis for punitive action constitutes unconstitutional retaliation by a government official and leading to losses for both plaintiffs.

4.      In Arizona, where the Second Amendment is deeply valued and debates over the 1994 Crime Bill and the Assault Weapons Ban remain politically charged, Defendant Aja's attempt to frame Plaintiff as dangerous based on an inferred belief about gun policy reveals personal animus and broader institutional intolerance for disfavored viewpoints. Her actions reflect a pattern of retaliating against constitutionally protected expression and associational liberty.

F.      Service During Psychiatric Hold (July 17, 2024)

1.      On July 17, 2024, while Mr. Gerrits was undergoing psychiatric evaluation at Palo Verde Behavioral Health, he was located and served with the IAH by a private process server. The service occurred inside the locked facility during an important evaluation in front of the psychiatrist. Defendant Aja, who was not a party to Mr. Gerrits' mental

11

health petition, arranged for the documents to be served at that time and location of Mr. Gerrits' mental health evaluation. The psychiatrist reviewed the legal papers and incorporated the allegations into his assessment. This service caused Mr. Gerrits visible confusion and distress and was heavily documented in the evaluation report. Mr. Gerrits' petition was later filed and withdrawn on or about July 19, 2024. The petition had not been formally filed through legal channels and was not a public record on July 17, 2024, making its disclosure and use by Defendant Aja unauthorized and improper. This act constitutes an egregious breach of Plaintiff's privacy and a misuse of legal process for retaliatory purposes.

G.    False Reports and Rumors

1.    While Mr. Gerrits was still hospitalized, Defendants Aja and others reported to PDS leadership, OCAC, and Presiding Judge Michael Butler that he had "threatened the court." On July 16, 2024, OCAC employee Kristina Dunlap called Ms. Wang and informed her that such a report had been made, and that an IAH had been filed against Mr. Gerrits. Ms. Wang immediately clarified that her husband had no access to firearms and made no threat.

2.    Despite this, the unfounded allegation spread widely across legal networks, causing further reputational damage, including to colleagues

1

2      3.     In early 2025, DCS agent Mogan Blacklock, based in Cochise County,

3             confirmed to Plaintiff Gerrits that she had been informed that Mr.

4
              Gerrits had "threatened the court with violence." This false and
5
6             defamatory statement mirrored the narrative previously circulated by

7             Defendants, even to Mr. Gerrits's clients, and confirms the smear

8             campaign had spread across jurisdictional lines. Assistant Attorney
9
              General Emily Romero was present during the conversation and did
10
11            not refute or correct the statement.

12     4.     After Plaintiff Shawn Gerrits was released from the hospital on or

13            about July 24, 2024, he returned to the Pima County Juvenile Court to
14
              retrieve mail related to his contracted cases. Upon arrival, he was
15
16            stopped by courthouse security and informed that he was not allowed

17            to enter the building. Plaintiff was told that he had been "flagged,"

18            and could not access the premises, even though the court was not
19
              listed as a protected location under the IAH. Plaintiff informed the
20
21            security personnel that the court was a public building, and that there

22            was no legal or administrative order prohibiting his presence there.

23            After some delay, security ultimately allowed Plaintiff to enter the
24
              building under escort and collect his mail ONLY. The following day,
25
26            Plaintiff received a phone call from Benjamin Mendola, asking

                                       13

whether he had "returned to the court and threatened anyone?" This inquiry indicated that a false and damaging rumor had circulated within the court system, implying that Plaintiff posed a threat after the dismissal of the 72-hour hold. This marked the second time Defendants made a false report alleging that Plaintiff, threatened the court, without any factual basis.

5.  Later that same afternoon, Mr. Mendola called Plaintiff back and stated that there had been a false report that Mr. Gerrits had returned to the courthouse and "made threats." Mendola informed Plaintiff that Presiding Judge Michael Butler had to watch the security footage with Defendant Aja. Judge Butler concluded that Plaintiff had not engaged in any threatening behavior. Following this confirmation, Plaintiff was again allowed access to the courthouse. The repetition of these allegations-despite judicial confirmation to contrary-demonstrates reckless disregard for truth and a deliberate and ongoing effort to harm Plaintiff's professional standing.

6.  On or about December 26, 2024, Court Security Officer Eric Hansen informed Plaintiff Gerrits that the restriction on his courthouse access was not ordered by Judge Butler, but rather by "your boss," referring to OCAC leadership.

H.  State Bar Reports

14

1.    Upon information and belief, after Defendant Aja reported Plaintiff Gerrits to the State Bar on July 16, 2024, she contacted the State Bar a second time approximately one month later, in August 2024, during this second contact, Defendant Aja questioned why Plaintiff had remained hospitalized for longer than seventy-two (72) hours and suggested that the State Bar investigate the reason for his extended stay. Notably, it was Defendant Aja's own conduct, specifically her decision to locate and serve Plaintiff inside a locked psychiatric unit, that contributed to the harm.  The service occurred in front of the evaluation psychiatrist during an active mental health assessment, and the incident was documented in the medical report. This disruption played a role in prolonging Plaintiff's hospitalization. Defendant Aja's conduct reflects a pattern of using legal tools for retaliatory purposes, rather than in good faith.

2.    It also begs two questions:

a.    How did Defendant Aja know that Plaintiff was hospitalized at Palo Verde Behavioral Health to serve him?

b.    How did she know the duration of his hospital stay?

3.    These two separate contacts with the State Bar, both unsolicited and unsupported by any claim of ethical misconduct, demonstrate a

15

sustained campaign of malicious retaliation and a deliberate effort to destroy Plaintiff's career by weaponizing confidential mental health information.

I.  Communication with Kristina Dunlap and Disclosure of Mental Health Breakdown

1.  On July 16, 2024, after the first false report was made to the court, Kristina Dunlap, an employee of OCAC, contacted Ms. Wang. Ms. Dunlap informed Ms. Wang that Jillian Aja and a group of colleagues ("a group of girls," as described) had reported Plaintiff Gerrits to Judge Michael Butler, and that people within the Juvenile court and related offices were "freaking out."

2.  During this conversation, Ms. Wang voluntarily disclosed to Ms. Dunlap that Mr. Gerrits had recently suffered a mental health breakdown and requested that the office show understanding and allow him some time to recover. Ms. Wang's disclosure was made in good faith, seeking to de-escalate tensions   and explain the situation, not to justify or excuse misconduct. Despite this, the OCAC's subsequent actions continued to escalate the situation, disregarding the disclosure and the request for time and accommodation. At no point did Ms. Wang authorize any party to disclose information regarding Mr. Gerrits's mental health status.

16

3.    On August 8, 2024, Mr. Gerrits provided a formal release from Palo Verde Behavioral Health to OCAC confirming he was cleared to return work.

J.    Arizona Attorney General's Office Involvement

1.    In August 2024, <u>Assistant Attorney General Sigyn Halverstedt disclosed to Mr. Gerrits that</u> while he was hospitalized for psychiatric care, individuals within the Arizona Attorney General's Office held internal meetings in which Mr. Gerrits was discussed and portrayed as a potential threat. His photograph was displayed on a wall in an internal workspace. Mr. Gerrits had not been charged with any crime, had no history of violence, and was never given an opportunity to respond. These actions took place without due process and contributed to his continued exclusion from public contract work in Pima County.

2.    <u>Early 2025, OCAC attorney Cynnamon Arizpuru disclosed to Mr. Gerrits that</u> during his involuntary hospitalization, Assistant Attorney General Ana Oliva requested court security to escort her to her vehicle, even though Plaintiff was not present in the courthouse and posed no risk to anyone.

3.    In November 2024, Assistant Attorney General David Braun approached Plaintiff in a professional setting and asked whether he

17

had been attending Alcoholics Anonymous (AA) meetings. Mr. Gerrits, who does not suffer from alcohol dependency, clarified that he had no need to attend AA. During the same conversation, Mr. Braun remarked, "We have to treat threats seriously," Mr. Braun contributed to the reputational harm and professional exclusion that Plaintiff continued to suffer, long after his mental health crisis and the dismissal of the IAH. The persistence of these damaging implications reflects a pattern of retaliation and stigmatization that further interfered with Plaintiff's career and public standing.

4.    Although not yet named as a defendant, the Arizona Attorney General's Office played a significant role in the chain of events that led to Plaintiff's exclusion and reputational harm. Several attorneys within the office, including those involved in initial false reports and continued perpetuation of damaging narratives, contributed to the retaliatory and stigmatizing environment Plaintiff faced. Individuals from the attorney General's office also attended internal meetings held by Pima County regarding Mr. Gerrits's return to work and contract status, further entangling the Office in the County's decision-making process. A Notice of Claim was served on the Arizona Attorney General's Office pursuant to A.R.S. § 12-821.01, and Plaintiff intends to formally name that office and associated

18

individuals as defendants upon the expiration of the statutory waiting period.

5. The involvement of individuals from the AZAG's Office, whose legal mandate is to prosecute, not to influence defense contracting, crossed a critical line, not just legally and ethically, but constitutionally. It was a boundary they never should have approached, let alone breached. These actions unfolded after the DOJ issued a formal warning about the mishandling of mental health in Arizona legal systems. What followed was not just a breach of professional norms, but a significant assault on the integrity of adversarial justice. It also shows the power of government institutions to join forces to silence dissenting voices of successful small-sized indigent defense focused law firms.

K. Professional Repercussions

1. On July 30, 2024, OCAC removed 21 court appointed cases from Mr. Gerrits. Many of these cases were reassigned under the direction of Defendant Aja's office or other PDS entities. These removals directly harmed the PLLC, as the contracting entity, by causing loss of assignments, revenue (approximately $11,000-$12,000 per month), and business goodwill. The PLLC received all payments for services under the contract, and these losses are traceable to Defendants' misconduct.

19

2.    August 6, 2024, Mr. Gerrits received a 95% score on his formal court performance evaluation.

3.    On August 7, 2024, OCAC supervisor Benjamin Mendola emailed Mr. Gerrits requesting a written summary of "the steps you are taking/have taken to avoid this in the future," and referenced an apparent belief that Mr. Gerrits had "stopped drinking" and was "routinely going to a counselor." In response, Mr. Gerrits clarified that the mental health petition had been dismissed, that he had no history of alcohol abuse, and that he had voluntarily begun counseling. He also raised serious concerns about the improper disclosure of his private health information and the apparent misuse of official channels to spread false allegations, specifically referencing Ms. Aja's involvement in initiating an injunction while he was hospitalized.

4.    On August 8, 2024, Defendant Mendola sent Plaintiff Gerrits the following email:

      *"Shawn,

      Thanks for your e-mail.

We acknowledge that you have the right not to disclose any of your medical or mental health records and we will respect your choices as to what you are willing to share.

That being said, given the events that recently occurred, you demonstrating concrete progress towards understanding and appreciating the gravity of the impact that behavior had on others would go a long way towards allaying fears that such behavior may repeat or escalate.

Anything you can do to advance that end would be good (but certainly not required) and help us feel more comfortable assigning you cases in the future.

Thanks Shawn.

Benjamin Mendola

Director

Pima County Office of Court Appointed Counsel

520-724-4463

Benjamin.Mendola@pima.gov"*

This communication directly tied future case assignments to Plaintiff Gerrits's perceived mental health status and the emotional reactions of others. Defendant Mendola acknowledged Plaintiff's right to keep medical and mental health records private, but nonetheless pressured Plaintiff to provide personal assurances and demonstrate "progress" in order to receive future work. The County relied on no formal misconduct finding, established safety policy, or individualized ADA-compliant process. Instead, it applied an informal, subjective emotional standard to determine whether Plaintiff and its PLLC could continue in his role and receive the ongoing benefit of the OCAC contract.

5.    On August 8, 2024, Mr. Gerrits submitted a formal release from Palo Verde Behavioral Health, confirming he had been cleared to return to work. He again requested reinstatement, explaining that he was actively seeing both a psychiatrist and a therapist.

6.    Despite this documentation, Mendola continued to press for additional mental health details in a follow-up phone call. Later that day, Mr. Gerrits's attorney, John Anderson, contacted Mendola and informed him that the release was legally sufficient and that no further disclosures were required. OCAC ultimately allowed Mr. Gerrits to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

return on August 26, 2024, but placed him on indefinite hold for new assignments. They prohibited him from covering for other attorneys and have imposed additional restrictions. Mendola also instructed him, at that time, to appear online "as much as possible" and not to check in his firearm at the courthouse. These conditions were not grounded in policy or any individualized safety evaluation. Instead, they reflected ongoing stigma related to his mental health crisis and a pattern of punitive, extra-legal decision-making. OCAC's actions interfered with Mr. Gerrits's ADA-protected rights and denied him the equal access and fair treatment under law. These restrictions also harmed the PLLC by limiting its ability to receive new assignments and generate revenue under the contract.

7.     On August 9, 2024, the day after Mr. Gerrits submitted his hospital release form and requested reinstatement, OCAC removed six additional cases from his calendar. This action came even though he had been medically cleared to return and was actively complying with follow-up care. The timing and nature of this removal further demonstrates that OCAC's actions were not based on objective safety considerations or workload needs, but instead reflected an ongoing pattern of exclusion and retaliation tied to his mental health crisis. Mr. Gerrits was given no opportunity to contest or appeal the removal of

these cases. It is unclear how OCAC and PDS can remove cases without insight from the court that appointed Mr. Gerrits or from his clients. No authority has been cited for this action to current date. These removals caused the PLLC to lose additional revenue and business opportunities.

8.    Gerrits's clients, including minors who had specifically requested him, were reassigned without their consent or due process. Upon information and belief, these clients were not given a fair opportunity to make an informed decision regarding their choice of counsel, or to effectively direct the goals of their own representation.

9.    A Department of Child Safety (DCS) employee communicated false and damaging information to at least one of Plaintiff Shawn Gerrits's former clients, H.D., following his removal from cases, stated to Plaintiff Gerrits and the PLLC he would no longer be represented by Mr. Gerrits because he "went crazy and got fired." Mr. Gerrits and the PLLC not only retained Mr. H.D., but he was successful in his contested termination trial and reunited with his family over the objections of both DCS and Minors counsel. They remain a happy family today.

10.   After August 26, 2024, Defendants allowed Plaintiff to retain thirteen (13) active cases under his contract, including minors, demonstrating

24

that they did not view him as a safety risk or unfit to practice law. As of the filing of this Complaint, Plaintiff Gerrits remains assigned to approximately six (6) active dependency cases under his existing contract with OCAC. This ongoing work contradicts any suggestion that Plaintiff is unfit, unstable, or unable to carry out his professional duties.

11.   In February 2025, Ms. Wang emailed the Presiding Judge Michael Butler to ask whether the Court had played any role in decisions impacting Plaintiff Shawn Gerrits's ability to continue work under his OCAC contract. Judge Butler responded and confirmed that the Court was not involved in "anything related to Shawn's continuing practice under OCAC contract." This statement made clear that there was no judicial order, recommendation, or evaluation behind the decisions to remove cases, place Plaintiff on hold, exclude him from case assignments, or remove him from the OCAC calendar. All such actions were made unilaterally by OCAC/PDS leadership. Despite this, Defendants continued to conduct closed-door evaluations and monthly meetings, maintaining the appearance of external authority while in fact acting solely on internal bias and retaliatory motives. They made strategic and tactical disclosures and legal movements to attack both Plaintiffs, as a result, the PLLC continues to lose revenues

25

in excess of $11,000 a month.

L.    Cochise County Reinstatement (July 30, 2024)

1.    Cochise County, another public employer in Arizona where Mr. Gerrits held a part-time position, conducted an independent investigation into Mr. Gerrits' situation. Upon confirming his fitness for duty, Cochise County arranged for temporary coverage during his medical recovery and welcomed him back to work as of July 30, 2024. Cochise County's actions demonstrate that reasonable accommodations for Mr. Gerrits were feasible, and that Defendants' refusal to engage in any similar process was discriminatory and retaliatory in violation of the ADA.

M.    Denied Due Process and Continued Retaliation

1.    Following Mr. Gerrits's release, he provided a hospitalization release form to OCAC, demonstrating that he was cleared to resume work duties. In addition, Ms. Wang verbally disclosed Mr. Gerrits's mental health condition to OCAC on July 16, 2024. Taken together, these communications placed OCAC on actual notice of Mr. Gerrits's disability. This notice triggered protections under the ADA.

2.    Following the first meeting held after Plaintiff Shawn Gerrits's release from hospitalization, OCAC Director Benjamin Mendola personally contacted Plaintiff by phone. During the call, Mr. Mendola informed

26

Plaintiff that Defendant Dean Brault had "listened to everyone" during the meeting and ultimately decided to continue Plaintiff's placement on hold. Mr. Mendola confirmed that OCAC employee Kristina Dunlap had spoken in support of Plaintiff, describing him as friendly and professional. However, despite this internal advocacy, Mr. Mendola stated that other participants in the meeting, including Defendants Jillian Aja and Assistant Attorney General Kaylin Payce, who entered negative opinions about the return of Mr. Gerrits to the court. Mr. Mendola further stated that Defendant Brault was treating the incident as a mental health crisis. This communication confirms that Defendants were fully aware of both the nature of Plaintiff's condition and the presence of conflicting opinions within their leadership structure, yet still chose to adopt and act upon the narrative advanced by biased actors.

3.     Following the meeting, Mr. Gerrits was placed on an indefinite hold from his contract with OCAC, without formal process. He was not allowed to receive new cases nor cover for the hearings of other attorneys. OCAC Director Benjamin Mendola informed Mr. Gerrits that a group of unnamed "decision makers" led by Dean Brault, would be meeting monthly to evaluate him.

4.     When Mr. Gerrits asked for guidance on how to improve himself to

27

satisfy the evaluation process, participate in the monthly meetings, inquired into the identity of the decision makers and the criteria being applied, he was told that such information could not be disclosed to him.

5.  Despite being cleared by every relevant authority, the State Bar, the presiding judge, law enforcement and the dismissal of the injunction, Plaintiff was never reinstated to his full role. He maintained a top court performance rating, received no client complaints, and continued handling sensitive juvenile matters under his standard contract. Yet monthly internal meetings, led by Defendant Dean Brault, were held behind closed doors without providing Plaintiff any opportunity to participate, respond, or defend himself.

6.  These meetings determined the course of Plaintiff's employment without offering him notice, a chance to be heard, or any form of individualized assessment. Pima County failed to initiate the interactive process required under the ADA, instead relying on stigma, speculation, and narratives advanced by biased actors. By excluding Plaintiff from this process, failing to clarify the record, and ignoring his continued professional competence, Defendants engaged in pretextual retaliation cloaked in administrative procedure—causing ongoing reputational, professional, and financial harm.

28

7.     Following his removal from the OCAC cases, multiple clients specifically requested that Mr. Gerrits continue as their appointed attorney. OCAC permitted two such requests. On August 20, 2024, Ms. Dunlap sent an email stating that Mr. Gerrits's client was "very excited" Mr. Gerrits remained her representative. Several OCAC contract attorneys also offered to return Mr. Gerrits's previously assigned cases to him, to help mitigate his financial loss and support his professional recovery. However, OCAC denied those offers, stating they had "their own pace" for rebuilding Mr. Gerrits's caseload. No formal explanation or criteria were provided. This refusal, despite clear client preference and peer support, further demonstrated Defendants' disregard for the individualized assessment process required under the ADA. Their opaque and arbitrary response functioned as continued exclusion, not based on legitimate safety concerns or performance issues, but on stigma and retaliation. Thus, causing additional professional, emotional, and financial harm to Plaintiff.

N.     Promised Reinstatement

1.     In the latter half of 2024, Plaintiff Shawn Gerrits was led to believe by Benjamin Mendola within Pima County OCAC that he would be reinstated and operating at full capacity under his existing contract by

29

January 2025. Relying on these assurances, Mr. Gerrits refrained from pursuing immediate legal action against certain individuals within Pima County, believing that the County was acting in good faith and that the matter would be resolved internally. His name was added back to the OCAC calendar in October 2024; however, he was not assigned any new cases. These representations created a reasonable expectation of reinstatement, upon which Plaintiff detrimentally relied by delaying legal action.

2. On December 4, 2024, Mr. Gerrits submitted a formal request to resume receiving new case assignments in accordance with his contract and the County's prior verbal assurances. He received no response. On December 24, 2024, Mr. Gerrits reached out to Benjamin Mendola, and was informed that he would "remain on hold until further notice." When Mr. Gerrits inquired about the previous understanding that he would return to full capacity in January 2025, no further explanation or response was provided.

O. Retaliation Without Court Oversight or Legal Process

1. On June 26, 2025, the Clerk of the Pima County Board confirmed that, following a thorough review, the Superior Court found no records disclosable under Supreme Court Rule 123. This official response supports prior statements by the court, including Judge Michael

30

Butler's February 2025 email, affirming that the judiciary was not involved in any decision concerning Mr. Gerrits's contract, case removal, or courthouse access. None of the actions taken by Pima County PDS or the Arizona Attorney General's Office, including allegations that Mr. Gerrits posed a threat or had "threatened the court," were ever submitted through formal legal channels. No court order, or threat assessment petition was filed. The complete absence of judicial process confirms that these actions were not about public safety, but were instead based on internal bias, retaliation, and reputational harm carried out behind closed doors, by a small group of longtime co-workers, within PDS and AZAG.

P.    Retaliation Following Notice of Claim (January 2025)

1.    On January 13, 2025, Plaintiff Gerrits filed a formal Notice of Claim with Pima County. Eleven (11) days later, his name was completely removed from the OCAC calendar. After filing a second notice for retaliation on January 28, 2025, Plaintiff was removed from the calendar distribution list entirely. The retaliation was immediate and unmistakable. These rapid, unexplained removals, unconnected to performance, support a clear inference of unlawful retaliation under 42 U.S.C. § 12203.

2.    Pima County OCAC maintains a near-total monopoly over the

31

dependency and juvenile court practice area in Pima County. Due to the centralized nature of appointments and contracts managed by Pima County OCAC, Plaintiff Shawn Gerrits is unable to continue practicing in his primary area of expertise within his home jurisdiction. This exclusion has been further reinforced through cross—agency coordination, as the AZAG's office, the primary prosecuting agency in dependency matters, also played a role in the events leading to his removal. As a result, Mr. Gerrits has been effectively blacklisted from his field of specialization in his home region, causing ongoing economic harm and professional isolation to both Mr. Gerrits and the PLLC.

Q.    Retaliatory and Misleading Contract Limitation in 2025

1.    On May 30, 2025, OCAC sent Mr. Gerrits a standard contract for the new fiscal year. The contract contained no modifications or restrictions indicating limited reinstatement. Mr. Gerrits signed and returned the contract in good faith and simultaneously sought clarification regarding the scope of his reinstatement, specifically, whether the County intended to fully reinstate him to the OCAC calendar and begin assigning new cases starting July 1, 2025, under the new contract.

32

2.    On June 4, 2025, attorney Karen Lara and Rebacca O'Brien acting on

behalf of Ms. Dunlap and Mr. Mendola, sent the following email to

Plaintiff Gerrits:

*"Mr. Gerrits,

We are answering your email on behalf of our clients Ms. Dunlap and

Mr. Mendola. Regarding your interpretation of the contract, we are

not your attorneys and cannot provide you legal advice. As to being

eligible to be assigned new cases, the intent of this contract is for the

pending cases that you were previously assigned to be completed. We

refer you to Section 6.3 of the contract."

Mr. Gerrits, on behalf of the contacting PLLC, asked for clarification

as to what constituted "good cause" under Section 6.3 regarding the

removal of his cases in July 2024. Ms. Lara did not address this

clarification. When Mr. Gerrits raised specific concerns regarding bad

faith, retaliation, due process violations, and noncompliance with the

ADA, Ms. Lara responded only that "We disagree with your

interpretation as well as your remaining comments."

3.    This post hoc reinterpretation of a contract issued without limitation

is further evidence of the County's ongoing bad faith and retaliatory

33

conduct. By continuing to exclude Mr. Gerrits from new assignments while invoking shifting justifications and refusing to provide a factual basis for their decisions, the County has compounded its prior misconduct and maintained an ongoing injury. This conduct supports Plaintiffs' claims under the ADA, Section 504, and 42 U.S.C. § 1983.

4.    The County's position, that the standard contract was retroactively limited, reflects arbitrary enforcement and confirms that Plaintiff remains excluded due to stigma, not law or performance. Based on public records released on June 25, 2025, Mr. Gerrits's new fiscal year contract had already been processed by the procurement department without any stated modification or limitation, further disproving the County's post hoc justification.

5.    On July 1, 2025, the start date of the new fiscal year, Mr. Gerrits was not fully reinstated under the OCAC contract, despite having signed and returned it in good faith. The contract, which was issued without any written limitations, was later retroactively interpreted by County officials as applying only to existing cases. This post hoc restriction was not disclosed at the time of signing and effectively continued Mr. Gerrits's exclusion from new case assignments.

6.    By that point, Mr. Gerrits had already raised written concerns about disability discrimination and constitutional violations under the ADA

34

1    and 42 U.S.C. § 1983, including a supplemental notice of claim

2    submitted to Pima County on June 9, 2025. The post-notice decision

3    to limit his contract, conveyed by County attorney Karen Lara on

4    behalf of OCAC leadership, Defendant Benjamin Mendola—reflects

5    retaliatory motive, malicious intent, and a broader pattern of systemic

6    misconduct inconsistent with contract law, ADA compliance

7    obligations, and basic principles of fair dealing. These actions, taken

8    after formal notice of protected claims, support Monell liability and

9    

10    further establish Defendant Mendola's personal involvement in

11    pattern of retaliatory conduct sufficient to defeat qualified immunity.

12    

13    R.    Public Records Requests and Lack of Production

14    

15        1.    Between June 15, 2025 and July 7, 2025, Plaintiff's wife Yang Wang

16            submitted public records requests to the Arizona Attorney General's

17            Office ("AZAG"), Pima County Public Defense Services ("PDS"),

18            and the Pima County Attorney's Office ("PCAO"), seeking

19            communications and documents relating to the access, use, and

20            dissemination of Plaintiff Shawn Gerrits's confidential mental health

21            information, as well as records concerning decisions to limit his case

22            assignments.

23

24        2.    On August 8, 2025, after Ms. Wang filed a special action lawsuit

25            against AZAG for failure to produce on July 21, 2025, Assistant

26

35

Attorney General Nation Whelihan sent a letter via email stating that the office would likely begin a rolling production of responsive, non-privileged documents by August 22, 2025.

3. On June 27, 2025, through the Pima County Clerk of the Board, PDS provided an estimated six-week timeline to produce records. That six-week period expired on August 8, 2025, without any production to the date.

4. On July 31, 2025, PCAO responded that it had no update and could not provide a timeline for producing the requested records.

5. Ms. Wang had offered to accept records on a rolling basis and to provide clarification as needed to facilitate production. To date of filing, none of the three entities has produced a single responsive record. The complete lack of production from all three entities, despite statutory obligations to respond, underscores the coordinated nature of Defendants' actions and the ongoing concealment of critical information relevant to Plaintiffs' claims.

S.    Summary Timeline of Key Events

1.    June 2024 – Workplace tensions escalated. Assistant Attorney General Kaylin Payce made a sexist remark toward Mr. Gerrits, alleging he would not have sent such an email to a male attorney.

36

2.  June 29, 2024 – Mr. Gerrits sent a mild, election-related joke by email to de-escalate interpersonal tension with colleagues.

3.  July 2, 2024 – Benjamin Mendola called Mr. Gerrits and informed him those anonymous complaints had been submitted and "a group is going after you," but assured him there would be no formal consequences.

4.  July 13, 2024 – Mr. Gerrits experienced significant emotional distress following the attempted assassination of President Trump and contacted Chris Lloyd to express concerns related to reputational harm and political violence.

5.  July 15, 2024 – Mr. Gerrits was transported to the Crisis Response Center (CRC).

6.  July 16, 2024

    a.  Dunlap called Ms. Wang and stated that a group of female attorneys had reported to Judge Butler that Mr. Gerrits had threatened the court.

    b.  Ms. Wang disclosed that Mr. Gerrits was undergoing a mental health crisis and requested understanding and time off.

    c.  Jillian Aja filed an Injunction Against Harassment (IAH).

    d.  First report made to the Arizona State Bar.

37

e.  Benjamin Mendola emailed Mr. Gerrits, stating the matter was now being handled by Dean Brault.

f.  Mr. Gerrits was transferred to Palo Verde Behavioral Health for further evaluation around 5pm.

7.  July 17, 2024 – Mr. Gerrits was located and served with the IAH inside a locked psychiatric unit.

8.  July 19, 2024 – A mental health petition was filed and subsequently withdrawn.

9.  July 24, 2024 – A second false report was made to Judge Butler. After reviewing courthouse surveillance footage with Aja, Judge Butler confirmed that Mr. Gerrits had not made any threats and cleared him.

10.  July 24, 2024 – Mr. Gerrits contacted the State Bar and cleared by the state bar.

11.  July 30, 2024 – OCAC removed 21 cases from Mr. Gerrits's assignment list.

12.  July 30, 2024 – Mr. Gerrits returned to work in Cochise County.

13.  August 6, 2024 – Mr. Gerrits received a 95% on his formal court performance evaluation.

14.  August 7, 2024 – Benjamin Mendola emailed Mr. Gerrits, stating that "concrete progress" would help allay fears that his behavior might repeat or escalate, and pressured him to release medical records.

15. August 8, 2024 – Mr. Gerrits submitted his medical release form and treatment plan to Mendola and Dunlap, formally requesting to return to work again.

16. August 9, 2024 – OCAC removed 6 additional cases from Mr. Gerrits, without explanation.

17. August 26, 2024 – OCAC allowed Mr. Gerrits to return to work on his remaining active cases, including those involving minor clients. However, he was placed under restrictions: he was instructed to be online "as much as possible," prohibited from checking in his lawful firearm at the courthouse, barred from receiving new case assignments, and not permitted to cover hearings for other attorneys.

18. September 3, 2024 – The court dismissed the IAH via directed verdict.

19. September 2024, OCAC and PDS leadership began holding monthly closed-door evaluation meetings regarding Mr. Gerrits's contract status.

20. October 2024 – Mr. Gerrits was placed back on the OCAC calendar but no new cases.

21. December 4, 2024 – Mr. Gerrits submitted another formal request to resume full work but received no response.

22. December 24, 2024 – Mendola emailed Mr. Gerrits stating he was "on hold until further notice."

39

23. December 26, 2024 – Court security informed Mr. Gerrits that his restricted courthouse access had not been order by Judge Butler, but was instead directed by "your boss," referring to OCAC leadership.

24. January 13, 2025 – Mr. Gerrits filed his first Notice of Claim against Pima County.

25. January 24, 2025 – OCAC removed Mr. Gerrits from the OCAC calendar.

26. January 28, 2025 – Mr. Gerrits filed a second Notice of Claim, citing retaliation.

27. February 2025 – Mr. Gerrits was removed from the internal OCAC distribution list.

28. February 13, 2025 – Presiding Judge Michael Butler confirmed in writing that the court was not involved in "anything related to Shawn's continuing participation under OCAC contract."

29. May 30, 2025 – OCAC sent Mr. Gerrits a standard new fiscal year contract without limitations. He signed and returned it in good faith, expressly reserving his rights under pending claims.

30. June 4, 2025

   a. Karen Lara responded on behalf of Dunlap and Mendola, asserting that the contract was to cover "pending cases only" and citing Section 6.3.

40

b.    Mr. Gerrits asked for clarification on the "good cause" required under Section 6.3 to remove cases. No response was provided.

c.    Mr. Gerrits raised serious concerns regarding violations of the ADA and 42 U.S.C. § 1983.

d.    Karen Lara replied, <u>stating they disagree with Mr. Gerrits's comments.</u>

31.   June 9, 2025 – Mr. Gerrits submitted a supplemental notice of claim to Pima County asserting new claims under ADA, and 42 U.S.C. § 1983, including allegations of disability-based discrimination, retaliation, and constitutional violations stemming from his exclusion and treatment following his mental health crisis.

32.   <u>June 15, 2025 – Ms. Wang submitted public records requests to AZAG and Pima County.</u>

33.   June 25, 2025 – Public records confirmed that Mr. Gerrits's new fiscal year contract had been processed by the Pima County Procurement Department without any stated limitations, contradicting OCAC's later claim that the contract was restricted to pending cases only.

34.   June 26, 2025 – The Clerk of the Pima County Board confirmed that no records were disclosable under Arizona Supreme Court Rule 123, Verifying that no formal legal channels were used to address any

41

safety concerns regarding Mr. Gerrits. This confirms that actions taken against him were not based on judicial orders or court findings.

35. June 27, 2025 – PDS estimated six additional weeks to complete the bulk of the public records review and redactions necessary to fulfill this request.

36. July 1, 2025 – Mr. Gerrits was not fully reinstated under the new contract, despite signing and returning it in good faith.

37. July 7, 2025 – Ms. Wang submitted a public records request to PCAO.

38. July 31, 2025 – PCAO responded to Ms. Wang, stating that the office had no update and could not provide an estimated timeline for producing the requested records. No further communication has been received from PCAO as of the date of filing.

39. August 8, 2025 – After Ms. Wang filed a special action lawsuit against AZAG, the AZAG's office responded by email stating it would begin producing responsive, non-privileged documents on a rolling basis.

**T.    Causes of Action**

**COUNT 1: Disability Discrimination in Violation of the Americans with Disabilities Act (Title II)**
(Against Defendant Pima County)

1. Defendant Pima County is a public entity subject to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, as amended by the ADA Amendments Act of 2008 ("ADAAA"). Under

42

§ 12132, public entities may not exclude qualified individuals with disabilities from participation in or deny them the benefits of services, programs, or activities, nor subject them to discrimination.

2.    The Pima County Office of Court Appointed Counsel ("OCAC") operates pursuant to a contract with Plaintiff's professional limited liability company to provide court-appointed representation as part of the County's public defense program. This program constitutes a "service, program, or activity" of a public entity within the meaning of Title II.

3.    Plaintiff Shawn Gerrits is a qualified individual with a disability due to a documented mental health condition and was also regarded as having such an impairment by Pima County. At all relevant times, he remained fully capable of performing the essential functions of his role as a court-appointed attorney, with or without reasonable accommodation. Defendants were aware or perceived that Plaintiff had a disability.

4.    Under the ADA Amendments Act of 2008, 42 U.S.C. § 12102(3)(A), an individual "regarded as" having an impairment need not establish that the perceived impairment substantially limits a major life activity; it is sufficient to show that the public entity took adverse action

43

1    because of the perceived impairment.

2    5.    On July 16, 2024, Plaintiff's wife Ms. Wang disclosed to Ms. Dunlap

3    that Mr. Gerrits was experiencing a mental health crisis. That same

4    afternoon, at 3:31 PM, Defendant Mendola emailed Plaintiff stating:

5    "We would ask you don't appear on OCAC cases for now. My

6    perspective/hope is that this is not the end of your relationship with

7    OCAC. We are just going to take a break (maybe 30 days) then take

8    it from there." Pima County took this action immediately after

9    learning of Plaintiff's mental health condition, without engaging in

10    the required interactive process or conducting any individualized

11    assessment based on medical judgment, current clinical knowledge,

12    or objective evidence. These actions were based on rumors,

13    generalized fear and stigma, not lawful ADA standards.

14    6.    Despite this exclusion, Pima County allowed Plaintiff to continue

15    representing existing clients, including minors, and Mr. Gerrits

16    continued practicing successfully in Cochise County, where he was

17    cleared to return to work without issue. This disparity underscores that

18    Pima County's exclusion was not based on functional ability but on

19    discriminatory assumptions about mental illness.

20    7.    At no point did Pima County initiate an ADA-compliant review,

21    consider reasonable accommodations, or apply any objective standard

44

to assess Plaintiff's eligibility. Instead, they relied on improper use of private records, vague and shifting "safety" concerns, and the emotional reactions of others to justify exclusion from a public program in violation of federal law.

8.  On August 8, 2024, Defendant Mendola sent an email (Section K) explicitly linking future case assignments to Plaintiff's "demonstrating concrete progress" in response to the perceived impact of his behavior, and to "allaying fears" that such behavior might "repeat or escalate." This email also acknowledged Plaintiff's right to keep medical or mental health records private, yet conditioned his professional reinstatement on subjective emotional comfort, without any individualized medical review or procedural safeguards.

9.  After Plaintiff submitted a formal Notice of Claim in January 2025, OCAC reversed a brief reinstatement to the calendar. In May 2025, Plaintiff was issued a standard fiscal-year contract with no stated restrictions. On June 4, 2025, attorneys Karen Lara and Rebecca O'Brien, acting for Defendants Dunlap and Mendola, sent an email (Section P) stating that "the intent of this contract is for the pending cases that you were previously assigned to be completed," citing Section 6.3, and responding to Plaintiff's ADA and retaliation concerns only with "we disagree with your interpretation as well as

45

your remaining comments." This retroactive interpretation continued

Plaintiff's exclusion and reflected retaliatory intent.

10. The County's exclusion of Plaintiff has now persisted for over one year, well beyond the six-month "transitory and minor" exception in the ADAAA's "regarded as" provision, 42 U.S.C. § 12102(3)(B), thereby establishing coverage under the statute.

11. These actions violated 42 U.S.C. § 12132 and reflect deliberate indifference to Plaintiff Gerrits's rights under the ADA and ADAAA. Pima County acted without justification, failed to follow lawful process, and excluded a qualified individual based on disability-related stigma and protected conduct.

12. As a direct result, Plaintiffs suffered loss of income, professional damage, reputational harm, and emotional distress. Defendant is liable for all resulting injuries.

9. Plaintiff incorporates by reference the facts in Sections A, B, F, G, H, I, K, L, M, N, O, P, and Q.

**Count 2: Discrimination Under Section 504 of the Rehabilitation Act**
(Against Defendant Pima County)

1. Defendant Pima County receives federal financial assistance and is subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Under Section 504, no otherwise qualified individual with a disability

46

1
2
3
4

may be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving such assistance.

5
6
7
8
9
10

2.  The Pima County Office of Court Appointed Counsel ("OCAC") operates pursuant to a contract with Plaintiff's professional limited liability company to provide court-appointed representation as part of the County's public defense program. This program constitutes a "program or activity" within the meaning of Section 504.

11
12
13
14
15
16
17
18
19

3.  Plaintiff Shawn Gerrits is a qualified individual with a disability within the meaning of 29 U.S.C. § 705(20) and 42 U.S.C. § 12102, in that he has a documented mental health condition and was also regarded as having such an impairment by Pima County. At all relevant times, he remained fully capable of performing the essential functions of his role as a court-appointed attorney, with or without reasonable accommodation.

20
21
22
23
24
25
26

4.  On July 16, 2024, Ms. Wang disclosed to Ms. Dunlap that Mr. Gerrits was experiencing a mental health crisis. That same afternoon, at 3:31 PM, Defendant Mendola emailed Plaintiff: "We would ask you don't appear on OCAC cases for now. My perspective/hope is that this is not the end of your relationship with OCAC. We are just going to take a break (maybe 30 days) then take it from there." This immediate

exclusion occurred solely by reason of Plaintiff's perceived mental health condition, without any individualized medical assessment, lawful process, or performance-based justification.

5. Following his hospitalization, and despite being cleared to return to practice in Cochise County, Pima County excluded Mr. Gerrits from new case assignments, imposed an indefinite hold on his participation, and failed to offer or evaluate any accommodations. These actions were taken solely by reason of his mental health condition and were not based on objective medical evidence or performance-related criteria.

6. Pima County allowed Plaintiff to continue representing existing clients, including minors, while simultaneously barring him from receiving new assignments—demonstrating that he remained competent to serve, and that his exclusion was based on stigma rather than legitimate risk assessment.

7. n May 2025, OCAC issued Plaintiff a standard fiscal-year contract with no stated restrictions, which Plaintiff signed and returned in good faith. At the same time, he preserved his rights to pursue pending claims. On June 4, 2025, Pima County, through attorneys Lara and O'Brien, retroactively interpreted the contract as limited to pending cases only (Section P). This limitation was never disclosed at signing

48

and was imposed after Plaintiff preserved his legal rights, reflecting discriminatory and retaliatory intent.

8.    Defendant failed to initiate an interactive process, offer reasonable supports, or provide equal access to a public defense program funded by federal dollars. These omissions violated the standards incorporated into Section 504, which mirror those in Title II of the ADA.

9.    The exclusion and restrictions on Plaintiff's participation have now persisted for over one year, well beyond the "transitory and minor" exception applicable to "regarded as" disabilities, 42 U.S.C. § 12102(3)(B), further establishing coverage under Section 504.

10.    As a direct result, Plaintiff suffered professional, reputational, emotional, and financial harm.

11.    Plaintiff incorporates by reference the facts detailed in Sections A, B, F, G, I, K, L, M, N, O, P, and Q.

**Count 3: Retaliation in Violation of the Americans with Disabilities Act** (Against Defendant Pima County)

1.    Under the ADA, 42 U.S.C. § 12203, it is unlawful to retaliate against an individual for asserting their rights, including disclosing a disability or requesting reasonable accommodations.

2.    Plaintiff Shawn Gerrits engaged in protected activity by:

a. Plaintiff's wife disclosed his mental health condition to Ms. Dunlap

49

on July 16, 2024, and requested understanding, temporary leave, and continued access to his professional roll as a court-appointed attorney;

b. Opposing his exclusion from new case assignment without lawful ADA procedures;

c. Preserving his legal rights regarding pending claims; and

d. Submitting a formal Notice of Claim on January 2025 and a supplemental Notice of Claim on June 9, 2025.

These actions were taken in good faith and constitute protected Activity under ADA.

3.    In response, Pima County engaged in adverse actions including placing Plaintiff on indefinite hold, removing him/PLLC from new case assignments, holding undocumented meetings about his status, and circulating false reports to justify continued exclusion. After issuing Plaintiff a standard fiscal-year contract in May 2025, retroactively reinterpreting it on June 4, 2025, through attorneys Lara and O'Brien, to limit him to pending cases only. These acts followed Plaintiff's disclosure and were taken under color of law.

4.    Despite being permitted to retain existing cases, including those involving minors, Defendants barred Plaintiffs from new appointments, showing the exclusion was not based on objective safety concerns or performance issues, but instead retaliatory in

nature.

5. The County took these actions without any individualized assessment, medical judgement, or legitimate safety or administrative justification, and in direct temporal proximity to Plaintiff's protected activity, establishing a causal line between the two.

6. The pattern of retaliation caused Plaintiff significant financial loss, professional harm, reputational damage, and emotional distress, and reflects deliberate indifference to his federally protected rights.

7. Plaintiffs incorporate by reference the factual background provided in Sections A, B, F, G, I, K, L, M, N, O, P, and Q.

**Count 4: Violation of Equal Protection Rights Under 42 U.S.C. § 1983**
(Against Defendants Dean Brault, Jillian Aja, Benjamin Mendola, and John Does 1–5, in their individual capacities)

1. Under 42 U.S.C. § 1983, state actors acting under color of law may not deprive individuals of constitutional rights, including the right to equal protection under the Fourteenth Amendment.

2. Plaintiff Shawn Gerrits and PLLC was similarly situated to other OCAC attorneys with known or perceived mental health conditions, asuch as B.M and J.H, as well as to female colleagues who made comparable professional communications or "acted upset." Yet he was subjected to disparate and adverse treatment without lawful

justification. <u>As a result, the PLLC suffered clear and verifiable losses.</u>

3.    Following his hospitalization and mental health disclosure, Plaintiff was removed from case assignments, placed on indefinite hold, and excluded from OCAC participation, while other similarly situated attorneys were not. This unequal treatment was not based on individualized assessments or safety concerns, but on stigma, bias, and retaliatory motive.

4.    Plaintiff also experienced gender-based discrimination. After a group email referencing the 2024 election, he was accused, through anonymous complaints, of sexism. These allegations were taken seriously without investigation, while similar conduct by other male attorneys went unaddressed or was treated more leniently.

5.    Defendants Mendola, Brault, Aja, and John Does 1–5 acted intentionally, or with deliberate indifference, to subject Plaintiff to unequal treatment based on disability, perceived disability, and gender. These acts were taken under color of state law and lacked any rational basis.

6.    Defendants' conduct violated clearly established equal protection rights under the Fourteenth Amendment. Their actions were not

justified by neutral policy or legitimate purpose, and no reasonable official would believe such treatment was lawful.

7. As a direct result, Plaintiff suffered lost income, reputational harm, emotional distress, and other compensable damages. Defendants are not entitled to qualified immunity.

8. <u>Although Defendants Brault and Aja were not formally employed by OCAC, each exercised influence over OCAC leadership regarding contract attorney assignments. Brault's position as head of Pima County PDS gave him oversight authority over OCAC operations, while Aja communicated directly with OCAC leadership about Plaintiff's status following his hospitalization and urged his removal from active assignments.</u>

9. Plaintiff seeks relief under § 1983, including compensatory and punitive damages, attorney's fees, and appropriate equitable relief.

10. Plaintiff incorporates by reference the facts in Sections A–E, F–H, I, K–Q.

**Count 5: Violation of Fourteenth Amendment – Stigma Plus Doctrine** (Under 42 U.S.C. § 1983)

(Against Defendant Jillian Aja in Her Personal Capacity)

1. Under the Fourteenth Amendment, individuals have a protected liberty interest in their reputation when defamation by a state actor is

53

combined with the loss of a tangible right or government benefit. This is commonly known as the "stigma plus" doctrine, established in *Paul v. Davis*, 424 U.S. 693 (1976).

2.  Defendant Jillian Aja, acting under color of law, knowingly accessed and misused confidential mental health information about Plaintiff Shawn Gerrits. She falsely characterized him as a threat to the court, despite no credible evidence, legal basis, or adjudication supporting such claims.

3.  Aja shared these false claims with third parties, including PDS leadership, OCAC leadership, and the court, resulting in Plaintiff being barred from the courthouse, professionally isolated, and indefinitely removed from receiving case assignments.

4.  At the time Defendant Aja made and disseminated these false statements, Plaintiff though the PLLC held an active FY2024-2025 OCAC contract, renewed in July 2024, about two weeks before his involuntary hospitalization, which, by its terms and the County's historical course of dealing, created a reasonable expectation of continued receipt of new assignments throughout the fiscal year. Plaintiffs had successfully performed under successive OCAC contracts without incident. Plaintiffs received a 95% formal performance review score from the court, reflecting strong

professional competence and reputation. The abrupt removal from the OCAC calendar and termination of new assignments, following dissemination of the false claims, deprived Plaintiff of a tangible and ongoing government benefit that the County had only recently confirmed through contract renewal.

5.    This combination of reputational harm ("stigmatizing statements") and loss of tangible government benefits (contract opportunities, court access, and public appointments) satisfies the "stigma plus" standard.

6.    Defendant Aja acted without notice, hearing, or any form of procedural safeguard. The resulting harm included serious reputational damage, public professional exclusion, and emotional and financial loss.

7.    Although the court dismissed Aja's IAH in a directed verdict, finding no credible threat, Defendant and others continued to circulate the same false narrative in professional settings, worsening the reputational harm and ensuring Plaintiffs continued exclusion and loss of goodwill and reputation to Mr. Gerrits and the PLLC.

8.    Aja's conduct was personal, intentional, and outside the scope of lawful duty. It was motivated by animus, executed in violation of clearly established law, and is therefore not protected by qualified immunity.

55

9. As a direct result, Plaintiff suffered lost income, reputational harm, professional exclusion and emotional distress. <u>Resulting in Plaintiffs' loss of their protected property interest in the OCAC contract and his personal liberty interest in having public access to the courts.</u>

10. Plaintiff incorporates by reference the facts in Sections C, D, E, F, G, H, K, M, N, O, P, and Q.

**Count 6: Violation of Fourteenth Amendment – Substantive Due Process (Under 42 U.S.C. § 1983)**
(Against Defendant Jillian Aja in Her Personal Capacity)

1. The Fourteenth Amendment protects individuals from arbitrary or egregious government conduct that interferes with fundamental rights. This includes the right to be free from deliberate abuse of state power that "shocks the conscience."

2. Defendant Jillian Aja, acting under color of law, deliberately accessed and misused Plaintiff Gerrits's private mental health information without any legitimate legal or governmental justification.

3. Aja escalated this abuse by falsely reporting that Plaintiff posed a threat to the court, despite no formal mental health petition, threat assessment, or evidence supporting such a claim. These accusations were based on private messages not directed to her and were never substantiated by legal process.

//

56

4.   Aja shared these reports with the court (resulting in Plaintiff being barred from the courthouse), with the Arizona State Bar (triggering professional scrutiny), and with Pima County leadership (leading to Plaintiff's removal from case assignments). These actions directly extinguished Plaintiffs' professional standing and contractual opportunities.

5.   Aja's conduct was not grounded in any public safety concern or administrative duty, but in personal animus, retaliation, and discriminatory bias. Her actions were arbitrary, vindictive, and abusive meeting the constitutional threshold of conduct that "shocks the conscience."

6.   The resulting harm to Plaintiffs was severe: reputational damage, financial loss, loss of professional standing, and lasting emotional distress. The harm was amplified by the fact that the Injunction Against Harassment was dismissed by the court in a directed verdict, and the service itself visibly exacerbated Plaintiff's mental health condition, as documented by a treating psychiatrist.

7.   These actions violated clearly established law and were take outside the scope of any legitimate governmental role. Defendant Aja is not entitled to qualified immunity.

8.    Plaintiffs incorporate by reference the factual background in Sections C, D, E, F, G, H, K, L, M, N, O, and R.

**Count 7: First Amendment Retaliation**
(Against All Individual Defendants in Their Individual Capacities)

1.    Under the First Amendment, individuals have the right to engage in protected speech, including political expression, criticism of public institutions, and petitioning the government, without facing retaliation by state actors.

2.    Plaintiff Shawn Gerrits engaged in protected speech, including:

    a.    Criticizing the 1994 Crime Bill, mass incarceration and related government policies;

    b.    Commenting on rising political violence and media coverage of such events; including potential influence by foreign states.

    c.    Reporting workplace discrimination to County officials;

    d.    Stating intent to pursue legal action if harassment continued;

    e.    Filing a Notice of Claim under Arizona law.

    These expressions addressed matters of public concern, race, justice, government ethics, and are entitled to the highest level of constitutional protection.

3. Defendants, including Aja, Brault, Mendola and Does 1-5. Were aware of Plaintiff's protected speech and legal actions before taking the adverse measures described below which also impacted revenue and opportunities to the PLLC.

4. In close temporal proximity to Plaintiffs' protected activity, Defendants, acting under color of law, took materially adverse actions that would deter a person of ordinary firmness from continuing to engage in such activity, including:

a. Filing an IAH based on private texts not directed at her or sent to her, shortly after Plaintiff's political statements;

b. Removing Plaintiff from court-appointed assignments;

c. Defendants circulated false accusations that Plaintiff posed threats or made discriminatory comments, using these statements to justify continued exclusion;

d. Defendants held closed-door meetings about Plaintiff's reputation and eligibility for work;

e. Defendants misused confidential health information to discredit Plaintiff and block reinstatement;

f. Retroactively limited Plaintiff's contract to pending cases only after Plaintiff preserved his rights to pending claims.

4.    During the IAH hearing on September 3, 2024, Defendant Jillian Aja testified that Plaintiff's reference to the 1994 Crime Bill reflected "his position on the assault weapons ban." This distorted private, anti-carceral commentary shared with Chris Lloyd into a pretext for state action, revealing viewpoint discrimination based on Plaintiff's protected political views.

5.    The retaliatory conduct was not based on performance, safety concerns, or neutral administrative policy. It stemmed from disagreement with Plaintiff's speech and perceived political views.

6.    The First Amendment prohibits such retaliation by public officials. Plaintiff's speech was lawful, non-threatening, and constitutionally protected. The right to speak on matters of public concern, including criticism of government policies, was clearly established at the time.

7.    As a direct result of Defendants' retaliatory conduct, Plaintiff Gerrits captioned above suffered economic loss, professional exclusion, reputational injury, and emotional distress.  The PLLC suffered economic harms and loss of revenue, business opportunity, and goodwill.

8.    Defendants' conduct was intentional, carried out under color of law, and not justified by any legitimate government interest. They are not entitled to qualified  immunity.

60

9. Plaintiffs seeks all available remedies under § 1983, including compensatory and punitive damages, attorney's fees, and declaratory or injunctive relief.

10. Plaintiffs incorporate by reference Sections A, C–F, G–H, J, K, M–Q.

**Count 8: Targeted Retaliation for Protected Activity**
(42 U.S.C. § 1983 – Against Defendants Dean Brault and Benjamin Mendola, in their individual capacities)

1. Plaintiffs reallege and incorporate all preceding paragraphs.

2. This Count addresses individualized retaliation by Defendants Dean Brault and Benjamin Mendola following Plaintiff's protected legal activity, specifically, his formal Notices of Claim against Pima County filed on January 13 and 28, 2025.

3. These filings constitute protected activity under the First Amendment, as recognized in *Borough of Duryea v. Guarnieri, 564 U.S. 379 (2011)*.

4. Within two weeks of the second Notice, Defendants, acting under color of state law, removed Plaintiff from OCAC's attorney calendar and internal case assignment list. This removal effectively cut off Plaintiffs' access to contract work, despite no misconduct findings or performance deficiencies.

5. The close temporal proximity between Plaintiffs' protected activity and these adverse actions supports a strong inference of retaliatory

intent, consistent with *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).*

6. As final decision-makers within PDS and OCAC, Brault and Mendola either personally directed, approved, or acquiesced in the retaliatory exclusion. Their roles establish individual liability under § 1983.

7. No neutral justification, such as negative evaluations, client complaints, or safety assessments, was provided. The lack of documentation confirms the exclusion was punitive.

8. In May 2025, Defendants issued Plaintiff a standard fiscal year contract with no limitations. After Plaintiff signed and reserved his legal rights, Defendant Mendola through counsel, retroactively claimed the contract was limited to pending cases only. This reinterpretation, unsupported by contemporaneous terms, illustrates continued retaliation for Plaintiff's legal claims.

9. These actions would deter a reasonable person from exercising their constitutional right to petition the government, and thus violate clearly established First Amendment protections.

10. As a direct result, Plaintiffs suffered lost income, reputational harm, emotional distress, and deprivation of constitutional rights. Defendants are not entitled to qualified immunity.

**Count 9: Violation of Procedural Due Process Rights (42 U.S.C. § 1983)**

62

(42 U.S.C. § 1983 – Against Defendants Dean Brault and Benjamin Mendola, in their individual capacities)

1. Under 42 U.S.C. § 1983, individuals acting under color of law are liable for depriving others of constitutionally protected rights, including procedural due process under the Fourteenth Amendment.

2. Plaintiff Shawn Gerrits and his PLLC held a protected property interest in continued participation in the Pima County court-appointed counsel program. This interest was grounded in longstanding assignment practices and the issuance of formal contracts for FY2024–2025 and FY2025–2026, both of which contained no limiting language and reflected a legitimate expectation of ongoing work.

3. Plaintiffs also possessed a liberty interest in avoiding professional exclusion based on stigmatizing, unsubstantiated claims, particularly where that exclusion harmed his reputation and standing in the legal community. See *Blantz v. Cal. Dep't of Corr., 727 F.3d 917 (9th Cir. 2013).*

4. Despite these protected interests, Defendants Brault and Mendola excluded Plaintiff from the attorney calendar and internal case distribution system without advance notice, explanation, or

opportunity to respond. These actions effectively terminated

participation in the program <u>by Plaintiffs</u>.

5.  In May 2025, after Plaintiff signed and returned a new fiscal-year

contract in good faith, <u>on behalf of the PLLC</u>, Defendants Mendola

retroactively claimed it applied only to pending cases, despite no such

limitation at issuance. This change, advanced through counsel and

unsupported by any contemporaneous documentation, functioned as a

post hoc deprivation without process.

6.  Plaintiffs requested clarification regarding the exclusion, including

the criteria for reinstatement and the identity of the decision-makers

involved in monthly meetings. These requests were ignored or denied.

No hearing, appeal, or procedural safeguard was offered.

7.  The exclusion was based on stigma, informal reports, and undisclosed

internal speculation related to Plaintiff's prior mental health crisis, not

on documented evaluations, complaints, or any objective findings.

Defendant Mendola refused to provide any return-to-work criteria or

process.

8.  These actions violated due process principles articulated in *Cleveland

Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)*, which require notice

and an opportunity to be heard prior to deprivation of protected

interests.

64

9.  The complete lack of procedural safeguards also fails under *Mathews v. Eldridge, 424 U.S. 319 (1976)*, where the risk of erroneous deprivation is high and alternative protections were absent.

10. Because the exclusion was arbitrary, stigmatizing, and retaliatory, and violated clearly established law, Defendants are not entitled to qualified immunity.

11. As a direct result, Plaintiff suffered lost income, reputational harm, emotional distress, and long-term damage to his legal career.

12. Plaintiff seeks compensatory and punitive damages, attorney's fees, and any declaratory or injunctive relief available under 42 U.S.C. § 1983.

13. Plaintiff incorporates by reference the factual background in Sections K, M, N, O, P, and Q.

**Count 10: Municipal Liability Under Monell (42 U.S.C. § 1983)**
(Against Defendant Pima County)

1.  Under *Monell v. Dep't of Social Services, 436 U.S. 658 (1978)*, municipalities are liable under § 1983 when constitutional violations are caused by official policies, established customs, or the acts of final policymakers. Defendant Pima County is liable under this standard for violating Plaintiff Gerrits's rights under the Fourteenth

1    Amendment, the ADA, and related federal laws <u>and those of his</u>

2    <u>PLLC.</u>

3  2.    Although Pima County maintains formal policies regarding due

4    process, disability rights, and nondiscrimination, it failed to enforce

5    them in practice. Final policymakers, specifically Dean Brault and

6    Benjamin Mendola, acted outside policy boundaries        without

7

8    oversight, discipline, or accountability.

9

10  3.    Pima County failed to:

11    a.    Supervise, train, or discipline officials who targeted

12          Plaintiff for exclusion;

13    b.    Prevent unauthorized access to and misuse of protected

14          mental health information;

15

16    c.    Investigate or address Jillian Aja's misuse of

17          confidential hospitalization records;

18    d.    Identify the source of the leak that enabled service of

19          process inside a psychiatric facility;

20

21    e.    Respond meaningfully to evidence of bias, retaliation,

22          and improper conduct;

23    f.    Provide any procedural pathway for Plaintiffs to contest

24          his exclusion or restore participation.

25

26  4.    These failures were not isolated. They reflect a persistent,

systemic indifference toward constitutional protections,

particularly for independent contractors, who lacked internal

recourse and were vulnerable to unchecked discretion.

5.   In June 2025, public records revealed:

    a.   That Plaintiffs' new fiscal-year contract was processed

        without limitation by the Procurement Department;

    b.   That the Arizona Supreme Court had no record of formal

        legal or security processes to justify Plaintiff's exclusion.

        These disclosures undermined the legitimacy of the

        County's post hoc safety rationale.

6.   The County reversed course after Plaintiffs asserted legal rights, retroactively limiting the contract and excluding them from new case assignments. This sequence demonstrates that retaliation, not legitimate policy, drove the decision.

7.   On June 25, 2025, public records confirmed that PLLC's new fiscal year contract had been processed by the Pima County Procurement Department without any stated limitations, contradicting OCAC's later claim that the contract was restricted to pending cases only.

8.   After Plaintiffs raised ADA and § 1983 concerns, County counsel Karen Lara, responding on behalf of final decision-makers,

summarily dismissed his concerns, stating: "We disagree with your comments." No investigation followed. No interactive process was offered. This institutional dismissal, issued through counsel, reflects deliberate indifference and ratification of the underlying discrimination.

9.   Pima County further ratified egregious privacy violations by failing to investigate or discipline Jillian Aja, who accessed and weaponized protected health information to target Plaintiff, causing long-term professional harm to him and his PLLC.

10.  These actions, combined with ratification of known misconduct and abdication of supervisory duties, constitute an unlawful policy, practice, or custom under *Monell and Clouthier v. County of Contra Costa, 591 F.3d 1232 (9th Cir. 2010).*

11.  As a direct result, Plaintiff suffered exclusion from public service, reputational harm, economic losses, and emotional distress.

12.  Pima County is therefore liable under 42 U.S.C. § 1983 for systemic constitutional violations arising from its failure to act, tolerance of misconduct, and ratification by final policymakers.

**Count 11: Conspiracy to Violate Civil Rights**
(42 U.S.C. § 1983 – Against Individual Defendants Dean Brault, Benjamin Mendola, Jillian Aja, and John Does 1–10, in their individual capacities)

1.      Under 42 U.S.C. § 1983, individuals acting under color of law who conspire to deprive another of federally protected rights are liable for resulting constitutional violations. Defendants Brault, Mendola, Aja, and John Does 1–10 entered into an agreement, express or implied, to violate Plaintiffs's rights under the First and Fourteenth Amendments and the ADA.

2.      The conspiracy's purpose was to suppress Plaintiff's protected speech, retaliate for his legal and disability-related disclosures, interfere with the PLLC's court-appointed counsel contract, and damage Plaintiff's reputation and livelihood.

3.      In furtherance of the conspiracy, Defendants undertook coordinated and unlawful acts, including:

   a.      Circulating false or misleading statements about Plaintiff's fitness to practice law;

   b.      Placing Plaintiff on indefinite hold and removing case assignments without due process;

   c.      Holding internal meetings where Plaintiff was portrayed as a threat, including reports that his photo was displayed in the AZAG's Office to   stigmatize him as dangerous;

69

d.    Reaching out to Pima County court security to improperly expand the scope of the IAH to include Juvenile Court access;

e.    Making anonymous reports to OCAC leadership accusing Plaintiff of racism    and sexism;

f.    Accessing and disclosing protected mental health records without legal basis;

g.    Arranging for Plaintiff to be served with process during involuntary    psychiatric hold to maximize reputational harm;

h.    Spreading false claims that Plaintiff posed a threat, including statements by Assistant Attorney General Ana Oliva requesting security and implying dangerousness, despite no threats being made.

4.    These were not isolated incidents. On July 16, 2024, OCAC employee Kristina Dunlap informed Yang Wang that "a group of girls" had gone to Judge Michael Butler alleging threats by Plaintiff, while he was still hospitalized. Defendant Mendola confirmed that a group was actively "going after" Plaintiff.

5.    This coordinated effort reveals a shared understanding among Defendants to deprive Plaintiff of civil rights through retaliation, defamation, procedural exclusion, and misuse of state authority.

6.    The conspiracy was carried out with malicious intent and without

70

legitimate government purpose. The actions violated clearly established law and fall outside the scope of qualified immunity.

7.    As a direct result, Plaintiffs suffered significant harm, including professional exclusion, reputational damage, emotional distress, and economic loss to the PLLC.

8.    Plaintiff incorporates by reference the factual background set forth in Sections C, D, E, F, G, H, J, K, M, N, O, P, and Q, which detail the coordinated actions and motives supporting this claim.

**Count 12: Defamation**
(Against Individual Defendants, including Jillian Aja and John Does 1–10, in their individual capacities)

1.    Defendants, including but not limited to Jillian Aja and John Does 1–10, knowingly published false and stigmatizing statements about Plaintiff Shawn Gerrits, including claims that he posed a threat to the court and engaged in discriminatory or unprofessional conduct.

2.    After Mr. Gerrits engaged in protected political speech, Defendants retaliated by submitting anonymous or informal reports to OCAC accusing him of being racist and sexist. These accusations were wholly unsubstantiated and intended to discredit both Plaintiffs, isolate them professionally, and justify exclusion from future legal assignments.

3.    Defendants also circulated false claims that Plaintiff had posted threats, statements that were conveyed to court personnel, PDS

71

leadership, and colleagues, and that contributed to Plaintiffs being barred from court premises and removed from active contracts assignments. These statements were not part of any formal disciplinary or investigatory process and were made outside the scope of Defendants' official duties.

4. As these defamatory statements impugned Plaintiffs' fitness to practice law and falsely suggested Mr. Gerrits posed a danger to others, they constitute defamation per se under Arizona law. No qualified or absolute privilege applies to these extrajudicial, malicious, and professionally damaging statements which damaged the PLLC with provable financial losses and significant reputational harm within a small professional legal circle.

5. Defendants made these false statements knowingly or with reckless disregard for their truth, demonstrating actual malice. Their intent was to damage Plaintiff's reputation, justify continued exclusion from professional opportunities, and retaliate for his protected activity.

6. As a direct and foreseeable result, Plaintiff suffered substantial harm, including:

   a. Irreparable damage to his professional reputation;

   b. Emotional distress;

72

c.    Loss of court appointments and income <u>to the PLLC;</u>

d.    Long-term professional isolation in his area of expertise.

7.    The malicious and retaliatory nature of these defamatory statements justifies the award of punitive damages under applicable law.

8.    Plaintiff incorporates by reference the factual allegations detailed in Sections C, D, E, F, G, H, J, and O of this Complaint, which provide further evidence of the defamatory statements and their harmful impact.

**Count 13: False Light Invasion of Privacy**
(Against Individual Defendants, including but not limited to Jillian Aja and John Does 1–10)

1.    Individual Defendants, including but not limited to Jillian Aja, intentionally publicized or disseminated statements and implications that placed Plaintiff Shawn Gerrits in a false light, portraying him as dangerous, unstable, or professionally unfit.

2.    These false portrayals were conveyed not through formal findings or legitimate evaluations, but through exclusionary actions, such as removing Plaintiff from case assignments, placing him on indefinite hold, and isolating him professionally, without any stated justification, hearing, or opportunity for response.

3.    These defamatory implications were further exacerbated by actions taken by personnel at the AZAG's Office, who:

a.    Posted Plaintiff's name and photograph on internal office

73

walls;

b.  Held meetings focused on Plaintiff's alleged threat status and;

c.  Circulated speculative inquiries regarding his possible involvement in recovery programs like Alcoholics Anonymous, despite no factual basis or professional relevance.

4.  These statements and actions, viewed together, created the public and professional impression that Plaintiff was unstable, potentially dangerous, or ethically compromised, all of which were demonstrably false and grossly misleading. At the time, Plaintiff had resumed legal work in other counties, received positive court performance evaluations, and had the IAH dismissed on directed verdict.

5.  These implications were widely circulated within Plaintiff's professional network, including judges, attorneys, court staff, and agencies with influence over his public defense career, causing lasting stigma and damage.

6.  A reasonable person would find such a portrayal highly offensive, particularly given Plaintiff's long-standing record of public service and his ability to perform legal duties competently. Defendants' actions misrepresented Plaintiff's character, integrity, and fitness to practice law.

7.   Defendants acted knowingly or with reckless disregard for the truth. Despite having access to exculpatory information, they continued to treat and portray Plaintiff as a threat, thus perpetuating harmful falsehoods.

8.   As recognized in *Godbehere v. Phoenix Newspapers, Inc., 162 Ariz. 338 (1989),* such conduct constitutes false light invasion of privacy under Arizona law.

9.   As a direct and proximate result, Plaintiff suffered emotional distress, reputational damage, professional isolation, and substantial loss of career opportunity. Defendants' conduct was willful, malicious, and undertaken with intent to harm, justifying the imposition of punitive damages.

10.  Plaintiff incorporates by reference the factual allegations set forth in Sections D, F, G, H, J, and O of this Complaint.

**Count 14: Public Disclosure of Private Facts**
(Against Defendant Jillian Aja, in her individual capacity)

1.   Defendant Jillian Aja intentionally disclosed private, sensitive medical and personal information about Plaintiff Shawn Gerrits, including non-public details of his mental health status, involuntary hospitalization, and location during a psychiatric hold.

2.    These disclosures were made without Plaintiff's consent, were not part of any formal proceeding, and bore no legitimate connection to any judicial safety concern or public duty. At the time, Plaintiff had not been charged with any crime, posed no active threat, and was undergoing confidential mental health evaluation and treatment.

3.    Defendant Aja used this confidential information to locate Plaintiff at the hospital and arrange for him to be served with an IAH during an active psychiatric evaluation. This was an act that was unnecessary for lawful service and was calculated to cause maximum reputational harm.

4.    These disclosures were not of legitimate public concern and would be highly offensive to a reasonable person. Defendant Aja's conduct violated established privacy norms under Arizona law, including the principles articulated in *Hart v. Seven Resorts, Inc.*, 190 Ariz. 272 (App. 1997).

5.    As a direct result of Defendant Aja's actions, Plaintiff suffered emotional distress, reputational injury, professional exclusion, and a prolonged psychiatric hold, as the disclosure became part of his medical and legal record.

76

6.    Defendant's conduct was undertaken with retaliatory motive and deliberate intent to harm, outside any legitimate legal function, and not protected by immunity.

7.    Plaintiffs incorporate by reference the factual allegations detailed in Sections F, G, H, and J of this Complaint.

**Count 15: Tortious Interference with Contractual Relations**
(Against Individual Defendants)

1.    Plaintiff Gerrits maintained valid contractual relationships with Pima County under the court-appointed counsel program, with the PLLC as the direct contracting entity providing legal services pursuant to formal agreements.

2.    Individual Defendants, including Jillian Aja and John Does 1–5, had knowledge of Plaintiff's contractual relationships and obligations.

3.    Defendants intentionally and improperly interfered with these contractual relations by providing false, misleading, and malicious statements about Plaintiff's competence, conduct, and fitness, including during monthly decision-making meetings where Plaintiff's contract status was discussed. These statements were not isolated incidents but part of an ongoing effort to block Plaintiff's reinstatement and damage his contractual standing.

77

4.    Defendants' actions were taken with malice or reckless disregard for the truth, with the purpose and effect of inducing Pima County to breach or terminate Plaintiff's contracts and hindering his ability to perform his professional obligations. <u>The PLLC suffered direct interference with its privity and revenue under the contracts.</u>

5.    As a direct and proximate result of this intentional interference, Plaintiff suffered economic harm, including loss of income, professional damage, reputational injury, and other compensable losses. <u>The PLLC's damages include lost revenue from removed cases.</u>

6.    The Defendants acted improperly, potentially some actions were outside the scope of their employment, and not protected by absolute or qualified immunity under Arizona law, as they were driven by malice and personal motive, not in furtherance of any legitimate government function. *Tortolita Veterinary Services, PC v. Rodden*, 252 Ariz 96.

7.    Plaintiff incorporates by reference the factual details provided in Sections C, D, G, H, J, K, M, N, O, P, and Q.

**Count 16: Abuse of Process**
(Against Defendant Jillian Aja, in her individual capacity)

78

1. Defendant Jillian Aja willfully misused legal process by filing and arranging tactical service of an IAH petition, not to address any genuine threat or adjudicate a legitimate dispute, but to retaliate against, discredit, and emotionally destabilize Plaintiff Shawn Gerrits during a period of acute medical vulnerability.

2. As a senior attorney familiar with the legal standards governing injunctions under Arizona law, Defendant Aja initiated the IAH based on private text messages that were neither sent to her nor contained any direct threats or contact. These messages reflected constitutionally protected speech. Defendant Aja knew or should have known that the petition lacked legal merit yet proceeded to invoke the court process to create reputational damage and institutional consequences for Plaintiff.

3. On July 17, 2024, while Plaintiff was under involuntary psychiatric hold, Defendant Aja located his confidential hospital placement and arranged service of the IAH inside a locked mental health facility, specifically during an active psychiatric evaluation session. This was not necessary to achieve legal service, nor was it prompted by an imminent safety concern. Rather, it was calculated to cause maximum psychological harm, ensure the allegations entered Plaintiff's clinical record, and further jeopardize his contract standing.

4.    As a direct result, the psychiatrist conducting the evaluation included the IAH and its allegations in the medical record, which contributed to the extension of Plaintiff's involuntary hold beyond 72 hours. Soon thereafter, the Arizona State Bar received a professional conduct complaint referencing Plaintiff's hospitalization and querying why he had not been released after 72 hours. While the identity of the complainant remains unconfirmed, the timing, content, and context strongly suggest Defendant Aja's involvement or orchestration.

5.    On September 3, 2024, the court dismissed the IAH on a directed verdict, finding that Plaintiff posed no threat and that the allegations lacked sufficient legal or factual basis. The court explicitly rejected Defendant Aja's claims of harassment. This outcome confirms that the IAH was not filed in pursuit of legitimate legal relief, but to inflict harm, escalate scrutiny, and manufacture justification for Plaintiff's exclusion from professional roles.

6.    Defendant Aja's conduct constitutes abuse of process under Arizona law. As set forth in *Nienstedt v. Wetzel, 133 Ariz. 348 (App. 1982),* abuse of process occurs when a legal procedure is misused for an ulterior purpose unrelated to its intended function. Defendant Aja weaponized the IAH process to provoke institutional harm, stigmatize Plaintiff through medical and professional systems, and bolster her

influence over his contract fate, all outside the legitimate objectives of the injunction statute and her role as OCC supervisor.

7.  Defendant Aja's actions were intentional, retaliatory, and taken under color of law but for purposes wholly unrelated to any proper governmental function. As such, she is not entitled to qualified immunity.

8.  As a direct and foreseeable result of this abuse of process, Plaintiff suffered profound emotional distress, reputational injury, financial loss, and long-term career damage. The PLLC suffered clear financial and reputational damage of over $11,000 per month as a result of court exclusion on the basis of Aja's misrepresentations about Mr. Gerrits.

9.  Plaintiff incorporates by reference the factual background provided in Sections C, F, G, and H of this Complaint.

**Count 17: Breach of Confidentiality**
(Against Individual Defendants Aja and Does 1-5)

1.  Individual Defendants, including those acting as the petitioner and/or individuals within the Pima County Attorney's Office, owed Plaintiff Shawn Gerrits a legal and ethical duty of confidentiality, arising from their access to sensitive medical and legal information in the course of public employment or through judicial records subject to confidentiality restrictions.

81

2. Aja and Does 1–5, bound by state law and federal privacy standards, including the principles set forth in HIPPA and Ariz. Admin. Code R2-5A-301 and HIPAA, disclosed Gerrits's hospitalization to the State Bar, Judge Butler and individuals in the legal community without authorization.

3. These Defendants unlawfully disclosed Plaintiff's confidential mental health details, without authorization or lawful purpose, to Defendant Jillian Aja and others, enabling Ms. Aja to locate Plaintiff at the hospital during his period of mental health crisis. These disclosures were made without Plaintiff's consent, in violation of confidentiality expectations and outside the scope of Defendants' legitimate access rights.

4. The disclosure of such sensitive and protected information constituted a clear breach of confidentiality under applicable legal and ethical standards, including state and federal privacy protections.

5. As a direct result of this breach, Plaintiff was subjected to public exposure and humiliation, including being served with legal papers while hospitalized, causing severe emotional distress, exacerbation of his medical condition, and additional professional and reputational harm.

6.      On July 7, 2025, Plaintiff's wife Yang Wang submitted a public records request to the Pima County Attorney's office seeking communications and documents relating to the improper access and dissemination of Plaintiff's confidential mental health information. As of the date of filing, PCAO has not produced any responsive records. The lack of production further impedes Plaintiffs' ability to determine the full extent of the breach and underscores the need for judicial intervention to remedy the violation of confidentiality duties owed under Arizona law.

7.      Plaintiffs seeks compensatory damages, punitive damages, and any other relief the Court deems appropriate.

8.      The coordinated unlawful acts were undertaken with personal and retaliatory intent, outside the scope of legitimate government authority, defeating any claim of immunity.

**Count 18: Intentional Infliction of Emotional Distress (IIED)**
(Against Defendants Jillian Aja, Dean Brault, Benjamin Mendola, and John Does 1–5, in their personal capacities)

1.      Under Arizona law, a defendant is liable for intentional infliction of emotional distress when they engage in extreme and outrageous conduct, intentionally or recklessly, that causes severe emotional distress to another.

2.    Defendants Jillian Aja, Dean Brault, Benjamin Mendola, and John Does 1–5 engaged in extreme and outrageous conduct.  Defendants both individually and in coordination with one another, engaged in behavior that was designed to humiliate, destabilize, and professionally destroy Plaintiff Shawn Gerrits and avoid performing contractual obligations owed to the PLLC.

3.    Defendant Aja improperly accessed and disseminated Plaintiff's private mental health information and orchestrated the service of an IAH while Plaintiff was involuntarily hospitalized. The only reason Plaintiff's wife signed the mental health petition was out of concern for his wellbeing and fear of potential self-harm. When Plaintiff was located and served inside the locked facility, he was actively under suicide watch. The service occurred in front of Plaintiff's evaluating physician during a formal mental health evaluation session. The evaluator documented the IAH in the psychiatric report and noted its harmful impact on Plaintiff's mental state, which contributed to the extension of his psychiatric hold.

4.    According to Mendola, he was involved with Mendola and a group of "deciders" he refused to name.  He claimed the group was involved in recurring, closed-door meetings concerning Plaintiff's employment status and performance.  Mendola refused to share details about the

84

<u>meetings or criteria upon which Plaintiffs would be evaluated. Mendola refused to involve Plaintiffs in any interactive dialogue. Despite Plaintiff's repeated efforts to clarify expectations, satisfy evaluation criteria, and engage in professional reinstatement, Defendants intentionally excluded him and withheld any clear standards or path forward for him or the PLLC.</u>

5.    Defendants also continued to keep Plaintiffs on indefinite hold, denied Mr. Gerrits opportunities to cover for other attorneys, and ignored his ongoing requests to participate, further reinforcing a harmful and stigmatizing narrative that he was dangerous or unstable, despite no supporting evidence.

6.    John Does 1–5, including individuals affiliated with the AZAG's Office and other agencies, contributed to Plaintiff's emotional distress by organizing internal meetings where Plaintiff's photograph was displayed, making false reports that led to Plaintiff being barred from court buildings, and spreading false and stigmatizing claims to outside agencies, counties, and even Plaintiff's clients.

7.    Defendants' conduct was not based on legitimate safety concerns or formal adjudicative findings, but on retaliatory intent, stigma, and deliberate efforts to damage Plaintiff's career and well-being.

85

8.   This conduct was extreme, outrageous, and either intentional or reckless in its disregard of Plaintiff's rights and emotional health. It violated professional norms, weaponized medical vulnerability, and inflicted sustained psychological harm.

9.   As a direct and proximate result of Defendants' actions, Plaintiff has experienced and continues to experience severe emotional distress, including anxiety, humiliation, loss of trust, reputational damage, professional isolation, and economic loss. Defendants' actions were willful, malicious, and done with conscious disregard for Plaintiffs' rights, justifying the imposition of punitive damages under Arizona law.

10.  Defendants' conduct was undertaken outside the scope of lawful governmental duties and is therefore not subject to immunity.

11.  Plaintiff incorporates by reference the factual background provided in Sections C, D, E, F, G, H, J, K, M, O, P, Q and R, and any other relevant portions of this Complaint.

**Count 19: Breach of the Implied Covenant of Good Faith and Fair Dealing**
(Against Defendant Pima County, OCAC)

1.   The PLLC entered a contract with Pima County on July 1, 2025, to provide court-appointed legal services. The contract contained no express limitations on the assignment of new cases and was issued on

86

standard terms. After Plaintiff signed the agreement and expressly preserved his legal claims, Defendants, through counsel, retroactively asserted that the contract applied only to previously pending cases.

2.  This post-signature reinterpretation constitutes a breach of the implied covenant of good faith and fair dealing. Defendants acted in bad faith by depriving the PLLC of the benefits reasonably expected under the contract. By concealing the County's intent at the time of signing and using post hoc reinterpretation to continue the PLLC's exclusion, Defendants engaged in a bait-and-switch tactic motivated by retaliation and discriminatory animus.

3.  The PLLC relied on the agreement in good faith, believing it marked his return to the OCAC calendar and professional responsibilities. Instead, Defendants used the contract as a shield—avoiding accountability for past misconduct while quietly continuing Plaintiff's exclusion. As a result, the PLLC suffered economic loss, reputational damage, and emotional distress.

4.  See *Rawlings v. Apodaca*, 151 Ariz. 149 (1986); *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474 (2002). Defendants acted in bad faith by depriving the PLLC of the benefits reasonably expected under the contract. All contract damages and revenue claims are tied to this

breach, including lost monthly revenue of approximately $11,000-$12,000.

**Count 20: Breach of Contract**
(Against Defendant Pima County)

1.  Plaintiff incorporates by reference the allegations set forth in Sections A through Q above.

2.  The PLLC and Defendant Pima County entered into valid and binding contracts for fiscal years July 1, 2024–June 30, 2025("2024 Contract") and July 1, 2025–June 30, 2026("2025 Contract") for the PLLC's services as a court-appointed counsel under the OCAC program. The PLLC was the direct signatory, with Shawn Gerrits signing on its behalf and Benjamin Mendola signing for the County. All payments, including checks for services, were issued to the PLLC.

3.  Both contracts were issued by Pima County and signed by the PLLC. The 2025 Contract was issued as a standard agreement without any stated limitations and was processed by the Pima County Procurement Department accordingly.

4.  Plaintiff fully performed his obligations under the 2024 Contract, including maintaining active case coverage, appearing in court, and receiving a formal performance evaluation of 95%.

5. Plaintiff also stood ready, willing, and able to perform under the 2025 Contract, as evidenced by his formal medical clearance, reinstatement requests, and acceptance of the new contract in good faith.

6. Despite Plaintiff's eligibility and availability, Defendant materially breached the 2024 Contract by removing twenty-one (21) cases from Plaintiff's assignment list on July 30, 2024, without lawful justification, while the contract was still in force.

7. Defendant further breached the 2024 Contract by removing six (6) additional cases on August 9, 2024, the day after Mr. Gerrits submitted his formal medical release and requested reinstatement.

8. Defendant also materially breached the 2025 Contract by failing to assign new cases starting July 1, 2025, despite issuing a contract with no stated restrictions. This breach was compounded by Defendant's post hoc reinterpretation of the contract's purpose, which was not disclosed at the time of signing and was inconsistent with standard practices.

9. The Plaintiff suffered significant damages because of these breaches, including loss of income, disruption of professional relationships, and impaired ability to continue work in his area of specialization within his home jurisdiction.

10. Defendant's breaches were not based on any formal safety determination, misconduct finding, or contractually authorized process. Plaintiff was denied the benefit of his bargain under both contracts, causing foreseeable and ongoing harm.

**Count 21: Constructive Fraud**
(Against Defendant Pima County, OCAC and Benjamin Mendola in his individual capacity)

1. On July 1, 2025, the PLLC entered into a FY2025 contract with Defendant Pima County, OCAC, to provide court-appointed legal services. The contract was issued on standard terms, contained no express limitation on the assignment of new cases, and did not disclose any intent to restrict future assignments.

2. At the time of contract issuance, Defendants possessed a preexisting intent to limit Plaintiff's assignments solely to previously pending cases. This internal limitation was never disclosed to Plaintiff prior to execution but was later admitted in writing by Pima County' counsel, acting on behalf of Kristina Dunlap and Benjamin Mendola: "The intent of this contract is for the pending cases that you were previously assigned to be completed."

3. Plaintiff signed and returned the agreement in good faith, with the understanding that he was returning to the OCAC calendar under the same terms as other contractors. After executing the agreement and

preserving his legal rights under federal and state law, Plaintiff was informed by Defendants, through counsel, that the County's undisclosed intent had always been to restrict the contract to pending cases only.

4.    This post-signature assertion of intent constitutes a deliberate and material nondisclosure at the time of contract formation. Defendants had a duty to disclose their true intent given the disparity in information, their institutional control over Plaintiff's professional opportunities, and the fact that they knowingly issued a contract inconsistent with their internal position.

5.    Plaintiff reasonably relied on the County's silence and the plain language of the contract. Had the County's limiting intent been disclosed, Plaintiff would have immediately challenged the contract's terms or sought clarification before executing it, rather than relying on its standard language as evidence of reinstatement. Defendants' concealment deprived him of the opportunity to protect his legal and professional interests at the time of signing.

6.    As a direct result of Defendants' concealment and misrepresentation, Plaintiff suffered economic loss, reputational damage, and emotional harm.

7.    As such, Defendants Pima County and Benjamin Mendola are liable

91

for constructive fraud, having misled Plaintiff through material omission in violation of duties arising from their positions of trust and control over public defense contracting.

8. Although no formal fiduciary relationship existed, Arizona law recognizes that constructive fraud may arise where one party, by virtue of a special relationship of trust, confidence, or superior knowledge, has a duty to disclose material facts to the other. By exercising exclusive control over access to court-appointed counsel work and possessing superior, undisclosed knowledge of its preexisting intent to restrict assignments, Pima County and Mendola occupied such a position of trust and control with respect to Plaintiff's professional livelihood. This special relationship created a duty to disclose material limitations prior to contract execution. Defendants' deliberate omission of those limitations, despite knowing Plaintiff's reliance on the standard contract language, satisfies the elements of constructive fraud under Arizona law.

**Count 22: Tortious Interference with Prospective Economic Advantage**

(Against Individual Defendants)

1. Plaintiffs incorporate by reference the allegations set forth in Sections A through Q above.

92

2. The PLLC had reasonable expectations of future economic advantage through continued and expanded court-appointed assignments under its contracts with Pima County, based on its history of performance, positive evaluations, and the standard nature of such contracts in the jurisdiction.

3. Individual Defendants, including Jillian Aja, Dean Brault, Benjamin Mendola, and John Does 1–5, had knowledge of the PLLC's prospective contractual relations and business opportunities.

4. Defendants intentionally and improperly interfered with these prospective relations by circulating false and stigmatizing statements, engaging in retaliatory exclusions, and influencing Pima County's decisions to limit or withhold new assignments, without legitimate justification. These actions were motivated by personal animus, retaliation, and bias, not any lawful purpose.

5. As a direct and proximate result, the PLLC suffered economic harm, including loss of expected revenue (approximately $11,000–$12,000 per month), future assignments, and business goodwill.

6. Defendants' conduct was willful and malicious, outside the

93

<u>scope of their employment, and not protected by immunity</u> <u>under Arizona law. See</u> <u>*Snow v. Western Sav. & Loan Ass'n,*</u> <u>*152 Ariz. 27 (1986)* (recognizing cause of action for</u> <u>interference with prospective advantage);</u> <u>*Wagenseller v.*</u> <u>*Scottsdale Mem'l Hosp., 147 Ariz. 370 (1985)* (bad faith</u> <u>interference actionable).</u>

7.   <u>Plaintiffs incorporate by reference the factual details in</u> <u>Sections K, M, N, O, P, and Q.</u>

/

## V.    <u>RELIEF SOUGHT</u>

WHEREFORE, Plaintiffs respectfully request that the Court:

1.   Enter judgment in favor of Plaintiffs on all claims set forth in this Complaint.

2.   Award compensatory damages in an amount to be proven at trial, including but not limited to:

a.   Back pay and lost income <u>to both Plaintiffs;</u>

b.   Future lost income and diminished earning capacity resulting from professional exclusion from Plaintiffs' home jurisdiction;

c.   Emotional distress <u>to Shawn Gerrits;</u>

d.   Reputational and career-related damages <u>to both Plaintiffs;</u>

94

e.    Contract damage to the PLLC, including lost
      revenue   (approximately $11,000-$12,000 per month),
      assignments, business goodwill, and prospective economic
      advantages.

3.    Award punitive damages against individual defendants whose conduct was  malicious, willful, or in reckless disregard of Plaintiffs' rights.

4.    Award declaratory relief, including but not limited to:

a.    A declaration that Defendants violated Plaintiffs' rights under the Americans with Disabilities Act (Title II), Section 504 of the Rehabilitation Act, and 42 U.S.C. § 1983, including First and Fourteenth Amendment protections;

b.    A declaration that Pima County's failure to adopt or apply clear, objective, and non-discriminatory procedures for evaluating, excluding, or removing contracted attorneys violates Title II of the ADA and Plaintiffs' procedural due process rights.

5.    Grant injunctive relief, including:

a.    Removal or correction of false or stigmatizing internal records or reports maintained by Pima County or its agents;

b.    Implementation of policy safeguards to prevent future

retaliation, defamation, or discriminatory exclusion of similarly situated professionals.

6.    Award reasonable attorneys' fees and costs, to the extent recoverable under 42 U.S.C. § 1988, the ADA, contract, or other applicable law;

7.    Grant leave to amend this Complaint as necessary based on discovery or procedural developments and;

8.    Award such other and further relief as the Court deems just and proper in the interests of justice.

DATED this 20th day of August, 2025

_____

Shawn Gerrits, Esq.

96